ESTATE OF ABRAHAM GOLDSTEIN, DECEASED, ANNA GOLDSTEIN, ELLIE GOLDSTEIN AND ZIONA KAPLAN, EXECUTORS, AND ANNA GOLDSTEIN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 64232. Filed March 18, 1960.

---

*Samuel J. Foosaner, Esq.*, for the petitioners.
*Henry L. Glenn, Esq.*, for the respondent.

FORRESTER, *Judge:* The respondent has determined deficiencies in the income tax of Abraham Goldstein, deceased, and Anna Goldstein, husband and wife, for the year 1953 in the amount of $2,259.66. A deficiency has also been determined in the income tax of Anna Goldstein, individually, for the year 1954 in the amount of $1,704.48.

The issues for decision are:

1. Whether certain rights to insurance renewal commissions distributed to stockholders upon the complete liquidation of a corporation had an ascertainable fair market value at the time of distribution.

2. If so, what was that fair market value.

3. Whether the income to petitioner Anna Goldstein from that portion of said rights which had been originally distributed to the decedent, was income in respect of a decedent within the meaning of section 691 of the Internal Revenue Code of 1954.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are so found.

The petitioners are the Estate of Abraham Goldstein, who died on November 16, 1953, and who is hereinafter referred to as the decedent, and the widow of the decedent, Anna Goldstein, individually, who is hereinafter referred to as Anna. The executors of the decedent's estate are Anna, Ellie Goldstein, and Ziona Kaplan. Letters testamentary were granted them on December 7, 1953, by the Probate Court, District of Hartford, in the State of Connecticut, and they are residents of West Hartford, Connecticut.

The decedent and Anna were the sole stockholders of the A. & A. Corporation (hereinafter referred to as A&A), which was a Connecticut corporation formed in 1936. As a general agent for the Bankers National Life Insurance Company of Montclair, New Jersey (hereinafter referred to as the company), A&A received a commission on all first-year premiums (not here involved) and also received a commission on the yearly renewal of certain policies, of up to 7½ per cent for the first nine renewals and 5 per cent for the next five renewals.

Decedent's health began to deteriorate gradually in 1946. In that year, his son, and a year or two later another party, became associated with A&A. Both of these individuals assumed increasing managerial and operational duties as decedent's activities generally decreased.

A&A's general agent's contract with the company was terminated in 1946, and in about June 1950, all its assets, including approximately 5,000 insurance accounts, were distributed to its stockholders in a complete liquidation. The following table indicates an approximate breakdown of these accounts with respect to the face amount and type of the policy involved:

| Face amount | Number | Type | Number |
|---|---|---|---|
| $5,000 or under | 2,000 | Ordinary life | 3,500 |
| $5,000 to $10,000 | 2,000 | Endowment | 500 |
| $10,000 to $15,000 | 500 | Term | 500 |
| $15,000 to $20,000 | 200 | Miscellaneous | 500 |
| Over $20,000 | 200 | | |

The bulk of the renewal commissions on these accounts had more than 10 years to run.

Gain on the dissolution and liquidation of A&A was reported by its sole stockholders, i.e., decedent and his wife, in their 1950 Federal income tax return as follows:

Cash and fair market value of assets received from A&A, except
    rights to renewal commissions _____ $20,015.42
Less: Basis of A&A stock _____ 1,620.84

    Long-term capital gain _____ 18,394.58

Rights to renewal commissions were not included in the above computation of gain on the theory that they had no ascertainable fair market value at the time of distribution.

The actual proceeds from these rights during the years 1950 through 1957, inclusive, were as follows:

| | | | |
|---|---|---|---|
| 1950 | $8,599.40 | 1954 | $11,217.45 |
| 1951 | 17,366.49 | 1955 | 10,682.49 |
| 1952 | 16,547.14 | 1956 | 11,526.16 |
| 1953 | 15,887.29 | 1957 | 11,153.11 |

The decedent and Anna, in their joint 1953 Federal income tax return, reported the receipt, prior to the death of the decedent, of renewal commissions in the amount of $15,887.29 as long-term capital gain. Anna, who became the sole owner of said rights upon decedent's death, reported in her 1954 Federal income tax return the receipt of renewal commissions in the amount of $11,217.45 as long-term capital gain.

The A&A renewal commission rights were composed of two basic elements, which, for the purposes of this case, are termed the financial element and the contact element. The former is the expected commission to be collected from the rights per se, and the latter is the customer list that said rights constitute, which may lead to future business,

Although the renewal commission rights of a general agent are up to 5 years longer and of a different percentage than those of a subagent, the general agent's and subagent's rights are essentially of the same nature and their differences are not material.

The financial element of the A&A renewal commission rights had an ascertainable fair market value at the time of their distribution to the decedent and Anna in 1950, and their fair market value at that time was $70,000.

OPINION.

1. It is now well settled, and the parties acknowledge, that an exchange of corporate stock for assets in kind in a corporate liquidation is a closed transaction with respect to such assets as have an ascertainable fair market value at the time of the liquidation, but is not a closed transaction with respect to assets which at the time of liquidation do not have an ascertainable fair market value. *Susan J. Carter*, 9 T.C. 364, 370–371 (1947), affd. 170 F. 2d 911 (C.A. 2, 1948); *Westover* v. *Smith*, 173 F. 2d 90 (C.A. 9, 1949); *George J. Lentz*, 28 T.C. 1157 (1957); *Mace Osenbach*, 17 T.C. 797, 802–803 (1951).

The above concept stems from the case of *Burnet* v. *Logan*, 283 U. S. 404 (1931), where a taxpayer sold stock and received, in part consideration thereof, a contract providing for the payment of 60 cents per ton on all ore that the purchaser of said stock should thenceforth receive from a certain mining concern, which was under no obligation to mine any certain tonnage. The Supreme Court stated, in the *Logan* case, at pages 412–413, the following:

As annual payments on account of extracted ore come in they can be readily apportioned first as return of capital and later as profit. The liability for income tax ultimately can be fairly determined without resort to mere estimates, assumptions and speculation. When the profit, if any, is actually realized, the taxpayer will be required to respond. The consideration for the sale was $2,200,000.00 in cash and the promise of future money payments wholly contingent upon facts and circumstances not possible to foretell with anything like *fair certainty*. The promise was in no proper sense equivalent to cash. It had no ascertainable fair market value. The transaction was not a closed one. * * * [Emphasis supplied.]

In *Susan J. Carter, supra*, we applied the rationale of the *Logan* case to the situation where a taxpayer acquired commission contracts in exchange for her stock pursuant to a corporate liquidation. Since the exchange constituted a capital transaction, and *the parties agreed* that these commission contracts had no ascertainable fair market value when distributed to the taxpayer, we held that the exchange was not a closed transaction, and that the realization on the commission contracts of more than their basis was to be afforded capital gains treatment. The factual situation in *Westover* v. *Smith*,

*supra,* was almost identical with that of the *Susan J. Carter* case, *supra,* and the same result was reached. In *Westover* v. *Smith, supra* at 92, the following was stated:

Although there was no ascertainable fair market value at the time of liquidation, we find nothing in the statute requiring the market value to be measured immediately. In such a situation the only practicable and accurate method of measuring the contract's value is through the application of money to such valuation as it is received. The alternatives are to ascribe a *fictitious or speculative* value to the property, which was condemned in the Logan case, or to allow it no value, as urged by appellants. Such methods result in inaccuracies and inequities. We think the proper procedure is to measure the value of the contract as payments are received. [Emphasis supplied.]

The A&A renewal commission rights, as stated in our Findings of Fact, were composed of two basic elements, i.e., the financial element and the contact element, and respondent has determined the deficiencies in issue before us on the ground that the renewal commissions, obviously generated solely from the financial element, received by decedent and Anna in 1953 and by Anna in 1954 constituted ordinary income. Thus, the issue is whether the financial element of the A&A renewal commission rights had an ascertainable fair market value at the time of their distribution to decedent and Anna.

Since this value flows solely from the potential future income they will engender, it will not have an ascertainable fair market value if the expectation to receive future money payments is wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty. Petitioners contend that said rights do not have an ascertainable fair market value, and state the following on brief:

These commissions varied from 7½% of the premium paid for the second to the tenth year of the contract, to 5% of the premium paid for the eleventh to the fifteenth year. If all the policies were to remain in force for the full periods involved, without any termination by way of lapse, or death, it could be reasonably anticipated that these premiums would be received as they became due. Because of the fact that there was no way of determining with any degree of certainty which of the policies might lapse, or be cancelled or converted, the amount of renewal commissions became speculative and indefinite, from these aspects. Moreover, the probable deaths of many of the insureds over the respective renewal commission periods involved, had to be considered. Obviously, in the case of such a death, both the premiums and the renewal commissions payable under the policy, carried on the life of the deceased-insured, would automatically come to an end. * * *

However, the very existence of the insurance industry is based upon determining, through the use of actuarial and experience tables, how many policies will terminate over a given period of time, the causes of such terminations, and the probable number of renewal premiums that will be collected. The rights in question

stem from approximately 5,000 insurance policies, certainly a broad base upon which to ascertain the number and total amount of renewal commissions that will be realized from these rights with a *fair certainty*, and, thus, a determined fair market value of these rights would not be *fictitious or speculative*.

This was not the situation in those cases where it was found that assets had no ascertainable fair market value. In such cases,[1] there was only one or a limited number of assets in question in each case, and there were no actuarial or experience tables upon which the proceeds from these assets could be ascertained with a fair certainty.

The record in this case shows that for many years, one of this country's largest insurance companies has been valuing the financial element of insurance renewal commission rights in order that they may be used, *inter alia*, as collateral for commercial loans. This valuation procedure is based on actuarial and experience tables, and considers such factors as the potential termination of policies by lapse and by death and the present value of the commission actually collected in the future.

Moreover, there are certain individuals and "several banks in New York"[2] that buy the financial element of insurance renewal commission rights. It is not necessary that the whole world be a potential market before an asset can be said to have an ascertainable fair market value, but only that there are a sufficient number of potential buyers in order to assure a fair and reasonable price in the light of the circumstances affecting value. See *James Couzens*, 11 B.T.A. 1040, 1164 (1928).

Thus, we have found as an ultimate fact that the financial element of these rights had an ascertainable fair market value at the time of their distribution to the decedent and Anna in 1950.

2. The next issue for determination is fair market value at that time. Unfortunately the record does not contain sufficient evidence to make this determination without recourse to the so-called *Cohan* rule. See *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930). Substantial value is shown, but the record does not establish the potential total commissions to be collected on the rights in question, the reduction of this potential on the basis of actuarial and experience tables, or even the ages of the policyholders, or the number of years each policy had been in existence at the time of distribution.

Under the *Cohan* rule, where sufficient evidence is lacking upon which to base a "precise" determination, we are bound to make the finding upon such evidence as is contained in the record, resolving

[1] E.g., *Burnet* v. *Logan*, 283 U.S. 404 (1931) ; *Westover* v. *Smith*, 173 F. 2d 90 (C.A. 9, 1949) ; and *George J. Lentz*, 28 T.C. 1157 (1957).

[2] The statement that "several banks in New York" buy renewal commission rights is based upon the testimony of a general agent who was called on behalf of petitioners.

all doubts against petitioners because they bear the burden of proof. Having done so, we have found that the fair market value of the financial element of the A&A renewal commission rights at the time of their distribution to the decedent and Anna in 1950 was $70,000.

As to all such rights except those which came to Anna at Abraham's death, the parties are in agreement that if the liquidation transaction was closed in 1950 (and we have so held), then the renewal commissions actually received thereafter constituted ordinary income to the extent they exceeded the 1950 value determined above, and this computation will be made under Rule 50.

3. The final issue is whether the commissions paid after Abraham's death on that portion of the A&A renewal commission rights initially distributed to him are income in respect of a decedent, within the meaning of section 691, I.R.C. 1954 (not changed materially from section 126, I.R.C. 1939).

This presents an identical question to that decided in *Frances E. Latendresse*, 26 T.C. 318, affd. 243 F. 2d 577 (C.A. 7, 1957), certiorari denied 355 U.S. 830, as concerns those contingent renewal commissions which were there originally purchased. On the authority of such case we hold that the renewal commissions paid to Anna in 1954 on the rights which came to her from Abraham, were income in respect of a decedent and taxable to her as such under said section 691. Proper allowances, deductions, and recoupment of remaining basis, if any, all as provided in said section, will be made in the Rule 50 computation.

*Decision will be entered under Rule 50.*