The Union Commerce Bank and Subsidiaries, Union Properties, Inc., Parksafe, Inc., The Daisy Hill Company v. Commissioner.
Union Commerce Bank v. Commissioner
Docket No. 75094.
United States Tax Court
T.C. Memo 1961-260; 1961 Tax Ct. Memo LEXIS 91; 20 T.C.M. (CCH) 1359; T.C.M. (RIA) 61260; September 15, 1961
*91 Thomas V. Koykka, Esq., and Fred D. Kidder, Esq., for the petitioners. Clarence C. Roby, Esq., and Frank W. Hardy, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: The following deficiencies are in controversy: Year
Deficiency
1953
$212,982.53
1954
90,159.12
1955
136,858.59 The only issues remaining for our determination are (1) whether petitioner used an excessive rate in computing depreciation deductions; (2) whether petitioner's participating interest in liquidating trust had no ascertainable fair market value on October 15, 1940, so that petitioner is entitled to deduct its ultimate loss upon the final liquidation of the trust in 1953. Findings of Fact Some of the facts are stipulated and are so found. Petitioner is The Union Commerce Bank and its subsidiaries, Union Properties, Inc., Parksafe, Inc., and The Daisy Hill Company, parties to consolidated income tax returns filed on a cash basis for the calendar years 1953, 1954, and 1955, with the district director of internal revenue at Cleveland, Ohio. Both issues involved herein pertain specifically to Union Properties, Inc., but also to petitioner *92 as a group due to the filing of a consolidated return. Depreciation Issue In the years 1953-1955, petitioner Union Properties, Inc., owned the Union Commerce Building (hereinafter sometimes called the building), a 21-story bank and office building in Cleveland, Ohio, and its associated fixed equipment. The building is of steel frame with limestone exterior, tile floors, and marble in extensive quantities in the public lobbies and corridors. Construction of the building started in 1922 and it had some tenants in 1923. The Union Trust Company (petitioner's predecessor in interest) moved into the building in 1924. The building was completed in mid-1924 and was in substantial operation by 1926, although not then fully occupied. Title to the property has been held by divers corporations. However, each transfer, from the beginning, has been under circumstances whereby each transferee has taken the adjusted basis of its predecessor. The building, with its related equipment, cost $13,377,754.18 and, with additions and removals, had an unrecovered cost basis of $6,956,799.36 on January 1, 1953. Depreciation has been taken on the property from the time the building was put into use in *93 1924 at a composite 2 percent rate. Assuming no additions, if depreciation is taken at this composite rate, the property will be fully depreciated in 1977. Respondent has determined that, for the purposes of computing depreciation, the Union Commerce Building had a useful life of 40 years as of January 1, 1952. The building, one of the ten largest office buildings in the United States, was designed primarily to house a bank, the Union Trust Company, and approximately one-third of the building was designed for bank use. The design of the balance of the building, intended for office use, was subordinated to the needs of the bank and, as a consequence, factors of functional inutility built into the structure limit its useful life. The building contains 1,491.049 square feet of space, of which 929,612 is rentable. There is designed for bank use 502,924 square feet, of which approximately 55,000 square feet is utilized for banking purposes. The balance of the space in the bank area is such that it cannot easily be used for multiple tenancies. This limits the potential use of that area, as it can be utilized only by tenants whose needs for space are large, and such tenants are limited. *94 In 1953 the rent from the space designed for bank use equalled 46 percent of the net revenue (before taxes and depreciation) of the whole building. This area was largely vacant from the time that the Union Trust Company closed its doors during the bank holiday of 1933 until 1950, except for the operations of the liquidator of the bank from 1933 until 1938, and thereafter, during the period of World War II, the housing of various agencies of the Government. Management did not succeed in finding commercial tenants who could make use of that space until 1950. The building's ceiling heights, up to 17 feet, so exceed the normal that, had it been constructed with normal ceiling heights, the building would yield an extra 1 1/2 floors of rentable space. The two bank lobbies, each nearly the size of a football field, create large areas of subnormal space surrounding the lobby skylights. The double fire escapes, required by reason of the special-purpose design of the building for bank use, contribute to waste of space. The Union Commerce Building develops 9.6 square feet of rentable space per square foot of land, compared with the adjacent 21-story East Ohio Building, opened January 1, 1959, which *95 develops 19.7 square feet of rentable space for each square foot of land. The building is not centrally air conditioned (although the offices can be and, in many cases, are individually air conditioned) and lacks fluorescent lighting and acoustical ceilings. The cost of supplying the above improvements would be $6,000,000, $1,500,000, and $675,000, respectively. The building's terra cotta coping and ledges are disintegrating with age and one large wall leaks, causing periodic interior damage. Both of these problems involve physical depreciation and potential expense. The building's location on the corner of Euclid Avenue and Ninth Street, both major business streets, is an advantageous one in downtown Cleveland. By reason of the location of the Union Commerce Bank in the building and the location of the largest bank in Cleveland, the Cleveland Trust Company, directly across the street, the intersection of Euclid Avenue and East Ninth Street is the site of 60 percent of all the banking activity in Cleveland as measured by total bank assets. The interior of the Union Commerce Building is spacious and contains many impressive offices. Tenants in the Union Commerce Building have *96 included General Electric Company, Equitable Insurance Company, and Island Creek Coal Company and, as of June 1960, included Diamond Alkali Company, Aetna Life Insurance Company, and Ernst & Ernst, as well as the largest law firms in Cleveland. In June 1960, the Union Commerce Building was 100 percent occupied, a condition which it first reached in 1950. Since 1950, its vacancy rate has never been more than 10 percent and it has never advertised for tenants. The management of the building has been outstanding and has materially contributed to its earning power. The building's records disclose net income and (losses) before taxes (including depreciation as claimed) for the years 1926 through 1955 as follows: Income or
Year
(loss)
1926
$ 190,113.50
1927
403,067.73
1928
499,390.10
1929
514,825.87
1930
535,723.20
1931
535,813.38
1932
412,901.89
1933
209,207.53
1934
23,755.44
1935
(19,286.72)
1936
(36,157.28)
1937
7,230.48
1938
(290,285.28)
1939
(423,056.11)
1940
(426,019.23)
1941
(445,816.56)
1942
(420,909.51)
1943
(257,533.01)
1944
(159,475.98)
1945
(135,979.59)
1946
(134,319.96)
1947
33,045.31
1948
$ 130,642.90
1949
390,782.15
1950
723,369.38
1951
1,027,309.69
1952
1,143,554.49
1953
1,128,861.34
1954
1,118,247.42
1955
1,226,245.33
*97 Office buildings built before 1909 account for about 20 percent of the competitive office space available in downtown Cleveland. Some of these pre-1909 buildings have been renovated and generally they command a much lower rental rate per square foot of space than that of the Union Commerce Building. Office space available in downtown Cleveland has increased substantially. On January 1, 1953, 6,520,417 square feet of office space was available in the downtown area; by April 1, 1960, this had increased by more than 20 percent, and in the periphery, an additional 1,000,000 square feet of office space has been made available. During this period vacant office space in the downtown area increased from 79,600 to 512,908 square feet. Respondent disallowed petitioner's claimed depreciation on the building in the amounts of: Depreciation
Year
Disallowed
1953
$110,429.96
1954
111,116.82
1955
115,083.45
The remaining useful life of the building on January 1, 1953 was 24 years. Ascertainable Fair Market Value On February 12, 1931, petitioner's predecessor in interest loaned to Foreign Utilities, Ltd., $350,000. This debt had an adjusted basis of $305,255.03 *98 when, due to the insolvency of Foreign Utilities, Ltd., it was released by petitioner on October 15, 1940. The consideration received by petitioner for the release of Foreign Utilities, Ltd., was: (1) the collateral security for the loan, consisting of 151 shares of Cliffs Corporation, $5 par value, common; seven-eighth shares of Cliffs Corporation, $5 par value (warrant); 405 shares of Liquidating Shares, Inc., $1 par value cap.; (2) Foreign Utilities, Ltd.'s participating interest of 18.0226 percent in a trust of which J. Fred Potts was trustee (hereinafter called the Potts Trust). The following events led to the creation of the Potts Trust, which was also initiated due to an insolvency: Otis & Company (hereinafter called Otis-partnership), a partnership engaged in the brokerage and investment business, was in financial difficulty. Certain judgment creditors of Otis-partnership levied upon its assets and, through "proceedings in aid of execution" in the Court of Common Pleas of Cuyahoga County, Ohio, obtained title to the unpledged assets of Otis-partnership. A referee was appointed for the purpose of determining the value of these assets. Taking only the testimony of one William *99 R. Daley, who had been in charge of liquidating these assets for a number of years, the referee determined that as of October 3, 1940, the fair market value of these assets was $375,000. Soon thereafter, certain non-judgment creditors of Otis-partnership, including petitioner's debtor, Foreign Utilities, Ltd., contended that the action of the judgment creditors constituted a "preference" and threatened to have the proceeding set aside. This dispute was resolved by an agreement, also dated October 15, 1940, whereby the judgment creditors made these unpledged assets, plus $64,049.44 in cash, the corpus of the Potts Trust. The beneficiaries of this trust were some of the other creditors of Otis-partnership, each having a beneficial interest in proportion to its claim against the partnership. Petitioner's beneficial interest was 18.0226 percent. In consideration of this action by the judgment creditors, the non-judgment creditors released the individual partners of Otis-partnership (against whom the judgment creditors held notes) from any liability to them. The purpose of the trust was to liquidate the corpus and to distribute the proceeds to the beneficiaries, including petitioner. *100 The assets of the Potts Trust, which had a face value of $1,442,097.53, were what remained of a formerly larger group after up to 9 years of attempted liquidation. The trust consisted of: miscellaneous securities; unpaid brokerage accounts, in large part represented by unsatisfied judgments; notes and accounts receivable, subject to defenses, offsets, and counterclaims; and all choses in action and non-book assets of every nature and description formerly owned by Otis-partnership, including (a) 47 notes of individuals ranging in amount from $35 to $54,240.53, (b) 25 judgments against individuals ranging in amount from $134.78 to $56,413.17, (c) 58 balances on individual customer accounts ranging in amount from $8.89 to $213,687.32, (d) one account receivable of $46,715, (e) one Cleveland Stock Exchange seat, (f) stock in 26 companies, (g) one railroad bond, (h) one miscellaneous bond, (i) an interest in shares of Otis & Co., Inc., a corporation, subject to a prior pledge, and (j) $64,049.44 in cash. Thereafter the trust received additional assets, upon which nothing was ultimately realized. The process of realizing cash for the trust assets required much correspondence, travel, *101 and usually a lawsuit or near-lawsuit necessitating the retention of counsel in many parts of the country. The liquidation of the Potts Trust continued, with periodic distributions being made from the proceeds of sales, until December 1953, when petitioner received its final distribution. The total amount received by all of the beneficiaries of the trust was $244,142. Petitioner's total receipts from the trust amounted to $54,353.38. Petitioner took no cognizance of any loss for income tax purposes until 1953 when its interest in the Potts Trust was liquidated, at which time it deducted as a bad debt $226,124.31, [1] the difference between the basis of its loan to Foreign Utilities, Ltd., on the date of its exchange for an interest in the Potts Trust and its receipts from the Potts Trust. The parties are now in agreement that the deduction, whatever its amount, should be taken as a loss rather than as a bad debt. Respondent's determination, as set forth in the deficiency notice, was: 1. The deduction of $226,127.31 included the amount of $226,124.31 representing the account *102 of Foreign Utilities, Inc. for collateral loan which was cancelled as a result of agreements entered into in 1940 wherein [petitioner] received an interest in the Potts Trust. Since the debtor-creditor relationship between Foreign Utilities, Inc. and [petitioner] was terminated in 1940, the allowable loss with respect to this account has been computed as follows: Fair market value of assets
in the Potts Trust judicially
determined in 1940
$375,000.00
Interest of [petitioner] in
the Trust as assignee of
Foreign Utilities, Inc.
(18.0226%)
67,584.75
Total distributions by Trustee
to [petitioner], 1940 through
12/14/53
54,353.38
Loss allowable
$ 13,231.37
The 18.0226 percent participating interest in the Potts Trust held by petitioner had no ascertainable fair market value on October 15, 1940. Opinion On the first issue, the only question is the remaining anticipated useful life in 1953 of the Union Commerce Building, which, being purely a question of fact, is disposed of in our findings. Estimates of the future physical and economic life of property can never be more than a matter of judgment, Gambrinus Brewery Co. v. Anderson, 282 U.S. 638 (1931), *103 and, in our opinion, petitioner has carried the burden of showing that as the situation existed in 1953 it was reasonable to assume that the building would have no greater useful life than that according to which the petitioner has consistently estimated its depreciation deductions. At the worst, depreciation at the present rate will have the result that the building will have been fully depreciated by 1977 and that whatever its further life may then turn out to be, no further depreciation, at least on the basis of the present investment, [2] will be deductible by petitioner. And if the property should be disposed of, basis would be correspondingly reduced. On the whole record, even including the presumption of correctness of the determination, the conclusion seems warranted that petitioner's estimate of anticipated life was sufficiently in accordance with reasonable opinion as of 1953 so as to justify the deductions taken. Bulletin "F" (Revised January 1942), p. 17; Rev. Rul. 90, 1953-1 C.B. 43. *104 The second issue involves merely the question of whether in 1940 an interest in a trust received by petitioner's predecessor had an ascertainable fair market value. At that time a previously existing indebtedness owing to the predecessor was exchanged for the interest in a liquidating trust consisting of a number of miscellaneous properties. If this was a taxable event, the trust interest would have acquired a basis consisting of its fair market value at that time. Estate of Abraham Goldstein, 33 T.C. 1032 (1960). If, on the other hand, as petitioner contends, the 1940 transaction was inconclusive because of the absence of an ascertainable fair market value of what it received, then the trust interest would assume the basis of the debt for which it was exchanged, and only when the exchanged property was finally liquidated would it be possible to ascertain the final gain or loss on the transaction. Burnet v. Logan, 283 U.S. 404, 413 (1931); Miller v. United States, 235 F. 2d 553 (C.A. 6, 1956). With these principles, the parties are in agreement. The sole issue, accordingly, is the existence in 1940 of an ascertainable fair market value for *105 the interest in the trust received at that time. This is also primarily a question of fact and has also been disposed of in our findings. Not only was it uncertain what sum would finally be received for the heterogeneous assets, but the period over which the collection would have to proceed was also indeterminate. It is impossible to believe that any willing buyer would have been prepared to offer in cash at that time a sum sufficiently high to induce a seller to part with his prospects of realizing a substantial collection, at least in the absence of any pressing need for cash which, of course, would be inconsistent with the recognized definition of fair market value. In Re Williams' Estate, 256 F. 2d 217 (C.A. 9, 1958), affirming a Memorandum Opinion of this Court; The Troxel Manufacturing Co., 1 B.T.A. 653 (1925). Looking at the record from the vantage point of retrospect, James Couzens, 11 B.T.A. 1040, 1165 (1928), the figure of $375,000 attributed to the total trust assets turned out, after a liquidating period of 13 years, to be optimistic by some 50 percent. [3] A purchaser paying cash in 1940 with the prospect of a long future period *106 of liquidation would, of course, be entitled to discount this figure even further. It seems to us that under the circumstances, the only reasonable method of realizing the maximum amount on the assets received was that actually followed. But no one at that time could possibly foresee whether the proceeds or the period of time would be substantially greater or less than what it eventually turned out to be. Certainly, a cash purchaser paying $375,000 for the assets in 1940 would be entitled to feel that he had made a peculiarly bad bargain. The deduction in controversy was originally designated as a bad debt. The parties are in agreement that it was technically a loss, but it is immaterial since the bad debt deduction would be in the same amount. Respondent suggests for the first time on brief that petitioner has not shown that any loss whatever has been or will be suffered in the total transaction, basing this on indications that other collateral may have existed for the same debt. We regard this contention as inadmissible in view of the fact that the determination itself, recognizing that petitioner suffered *107 a loss from the indebtedness, [4] brings into question only its amount. And the computation of this loss in the deficiency notice assumes that only the trust assets had value. If this aspect of the controversy can be raised at this late date, see Warner G. Baird, 42 B.T.A. 970 (1940), appeal dismissed (C.A. 6, Oct. 10, 1941), it will at least place the burden of proving all necessary facts upon respondent, Rule 32, Tax Court Rules of Practice, and the production of any such proof has not been accomplished nor even attempted.
*108 Under all the circumstances, we can reach no other conclusion than that there was in 1940 a complete absence of an ascertainable fair market value and that, accordingly, final computation of the tax consequences was properly postponed until the year before us. To take account of other adjustments not in controversy, Decision will be entered under Rule 50. Footnotes
1. The actual amount claimed as a bad debt was $226,127.31. The difference of $3 is unexplained.↩
2. There seems to be little question, even in respondent's mind, that central air conditioning will be necessary to prevent the obsolescence of the building at a cost estimated by him of $6,000,000. His computation of the benefits to petitioner from such an investment is his only answer. We think this treatment of that phase of the situation puts the cart before the horse. If petitioner's management determines to embark on any such project, it may well be that the original investment as well as the additional cost would have to be amortized over a longer period since conceivably the economic life of the building would thereby be prolonged. But unless that happens, the shorter useful life will have to be accepted.↩
3. Total amount realized from the trust was not $375,000 but $244,142.↩
4. In spite of respondent's disingenuous attempt on brief to imply that it was the interest in the Potts Trust that was considered to result in a loss, the language of the deficiency notice makes this impossible. It refers to: "The deduction * * * representing the account of Foreign Utilities, Inc. for collateral loan which was cancelled * * *" And continues: "Since the debtor-creditor relationship between Foreign Utilities, Inc. and [petitioner] was terminated in 1940, the allowable loss with respect to this account has been computed as follows:" [Italics added.] Obviously, "this account" refers to the loan to Foreign Utilities, Ltd.↩