C. D. Stratton and Catherine Stratton, et al. [1] v. Commissioner. Stratton v. Commissioner
Docket Nos. 1746-66-1748-66.
United States Tax Court
T.C. Memo 1969-195; 1969 Tax Ct. Memo LEXIS 102; 28 T.C.M. (CCH) 1030; T.C.M. (RIA) 69195; September 25, 1969. Filed Myron E. Anderson, Idaho Bldg., *103 Boise, Idaho, for the petitioners. John D. Picco, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar year 1962 as follows: Docket No.
Petitioners
Deficiency
1746-66
C. D. Stratton and Cath- erine Stratton
$38,637.03
1747-66
A. Gordon Schlafke and Ardis Schlafke
38,799.74
1748-66
W. Earl Bryson and Mary Bryson
39,651.18 The parties have reached agreement with respect to all but one of the issues raised by the pleadings, leaving for our decision whether a restricted promissory note in the amount of $465,000 secured by a second mortgage, which note was distributed to petitioners as a liquidating dividend by a corporation of which they were the only stockholders constituted property which has an ascertainable fair market value at the date of the distribution. 1031 Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners C. D. and Catherine Stratton (husband and wife), W. Earl and Mary Bryson (husband and wife), and A. Gordon and Ardis Schlafke (husband and wife) all resided in Boise, *104 Idaho, at the time of filing the petitions in this case. Each of these couples filed a joint Federal income tax return for the calendar year 1962 with the district director of internal revenue for the district of Idaho. All petitioners report their income on the cash receipts and disbursements method of accounting. On March 18, 1959, C. D. Stratton, A. Gordon Schlafke, and W. Earl Bryson (hereinafter referred to as Stratton, Schlafke, and Bryson, respectively) organized Motor Hotels, Inc., an Idaho corporation (here-inafter referred to as Motor Hotels) for the purpose of having it construct and operate a motel in Boise, Idaho, to be called the Stardust Motel. On that date Motor Hotels issued 170 shares of $100 par value common stock to each of the organizers in exchange for $6,500 cash and a one-third interest in property having a basis of $31,500. No gain or loss was recognized or realized with respect to this transaction. The $17,000 basis of Stratton and Bryson in their 170 shares of Motor Hotels common stock remained unchanged at the time of dissolution of that corporation. Sometime after the organization but prior to the dissolution of Motor Hotels, Schlafke's basis in his *105 170 shares of Motor Hotels' stock was increased to $30,745.30 [2] as the result of a property settlement agreement arising from a divorce. Bryson previously owned a motel and is presently engaged in the motel and real estate business. Schlafke is a contractor or builder and Stratton was formerly in the hotel business. Motor Hotels completed construction of the Stardust Motel in late 1959 and in November of that year opened it for occupancy. Motor Hotels continued to operate the motel until May 1, 1962. The motel which includes 96 or 97 rental units, a restaurant and lounge, and a swimming pool, is located about 5 or 6 blocks south of the center of Boise, Idaho. On its corporate income tax returns for the taxable years 1959, 1960, 1961, and to May 1, 1962, Motor Hotels reported the following designated items in the amounts as shown: Year or
Rental
Officers'
Net income
period
income
salaries
Depreciation
(Loss)
Year ending
12-31-59
$ 19,780.61
$ 4,600.56
[7,105.52)
12-31-60
191,019.57
$ 36,000.00
26,470.42
14,666.20
12-31-61
315,389.14
58,135.00
33,937.63
37,237.85
Period
1-1-62 to5-1-62
88,501.99
18,000.00
11,365.7 5
6,780.93
*106 The Stardust Motel, including furniture and fixtures, had as of April 30, 1962, cost Motor Hotels a total of $649,950.42 composed of the following: Asset
Cost
Land
$ 85,907.57
Buildings
449,366.06
Furniture and fixtures
91,488.10
Swimming pool
10,935.54
Office furniture and fixtures
2,376.15
Paving
9,877.00
At a special meeting of the board of directors of Motor Hotels on May 11, 1961, it was resolved to investigate the possibility of selling or disposing of either the corporate assets or the stock. The property was listed with Paul B. Larsen (hereinafter referred to as Larsen) a realtor in the firm of Paul B. Larsen and Associates. Larsen who had been in the real estate business for about 30 years and whose firm is one of the largest in the area suggested that an arbitrary price of $1,160,000 be set for the assets of Motor Hotels but in listing the corporate assets with him for sale Motor Hotels set a price of $1,260,000. The sales price for the assets of Motor Hotels suggested by Larsen was not the result of an appraisal of the physical assets but was based on the income produced by the Stardust Motel. On or about July 25, 1961, Larsen informed *107 Motor Hotels that a prospective buyer for the corporate assets had been located and 1032 presented to the corporation's board of directors a document bearing that date entitled, "Receipt and Offer to Purchase" from Paul A. Zinner (hereinafter referred to as Zinner). The offer to purchase was at a price of $1,160,000 with $225,000 to be paid in cash and the balance by a purchase money contract which would provide for installment payments of $6,750 monthly and an interest rate of 6 percent per annum on the unpaid balance. The offer was to purchase the real property and all furniture, fixtures, equipment, supplies and other personal property used in the operation of the business known as the Stardust Motel. Under the offer the $6,750 monthly payments were to begin on December 1, 1961, and to continue on the first day of each month to and including December 1, 1976, with the remaining principal balance then payable. In the event the buyer were unable to refinance the balance in 1976, the seller agreed to carry the difference for a period not to exceed 2 years with a continuation of the monthly payments with interest of 6 percent per annum. Motor Hotels agreed to furnish a title *108 insurance policy insuring the title as being free and clear of all liens and encumbrances except for taxes for the year 1961. The transaction was to be closed on December 1, 1961. The rider attached to the "Receipt and Offer" included the following provisions: 1. The transaction would be subject to an audit of the profit and loss statements of the seller. 2. There would be no personal liability on behalf of the purchaser in connection with the financing of $925,000 of the purchase price. 3. Appropriate provisions would be made for subordinating the purchase money contract to a new first financing in the event additional units were built. 4. The transaction would be subject to the verification of the cost of building an extension to the restaurant and the availability of a loan in the sum of $20,000 for this purpose. 5. If the offer was accepted within 10 days by Motor Hotels, the parties would execute a formal contract upon such further terms and conditions as would be acceptable to both parties and the present offer should not be deemed a contract to purchase until such formal contract had been executed. 6. The purchaser should have the right to extend the closing of title *109 for an additional 2 months upon deposit of an additional $10,000 of the purchase price for each month of such extension. On August 4, 1961, Motor Hotels and Paul D. Powsner, an associate of Zinner, entered into an agreement entitled. "Contract for Sale of Stardust Motel." This contract superseded the "Receipt and Offer to Purchase" of July 25, 1961. Some of the terms of the contract for sale of the Stardust Motel differed from those contained in the "Receipt and Offer to Purchase." After Motor Hotels accepted the proposal contained in the "Receipt and Offer to Purchase," the buyers sought to issue securities to finance the purchase. The Securities and Exchange Commission informed them that in order to finance the purchase with securities they were required to take title to the property. For this reason, the contract of sale provided for conveyance of title to the purchaser with a note and mortgage to be given to the seller. The contract for sale provided in part as follows: 2. PURCHASE PRICE: The total purchase price to be paid by the Buyer to the Sellers and the manner of payment is as follows: $15,000.00, upon the execution of this agreement, the receipt whereof is hereby *110 acknowledged by check or checks, subject to collection. The proceeds of same to be held in escrow by Dale Clemons, Esq., until the closing of title. It is understood and agreed that said deposit of $15,000.00, together with further deposits made hereunder, if any, shall be a lien on the real property described in Schedule A, but shall not bar any other remedy of the Buyer. $230,000.00, in cash or by good certified or bank cashier's check or checks, drawn or endorsed to the order of the Sellers, in such proportion as they may direct, providing such direction is made in writing at least ten (10) days before the closing of title. $450,000.00, by taking title to a new first mortgage to be secured by Sellers, in that amount, from an institutional lender, at an interest rate not exceeding 6 1/2% per annum, for a term of not less 1033 than fifteen (15) years; principal and interest being payable in constant monthly installments in an amount which would liquidate the principal balance if the term of said mortgage were twenty years. The note which said mortgage secures and said mortgage shall be on such forms as the institutional lender shall usually use in making loans of this nature. *111 It is distinctly understood and agreed that neither; the Buyer nor his assignee, if any, need personally assume the payment of said note or mortgage. $465,000.00, by the Buyer, or his assignee, if any, executing, acknowledging and delivering to the Sellers, a note secured by a purchase money second deed of trust on the real property described in Exhibit "A", in that amount, payable as follows: In constant monthly installments of principal and interest in an amount which, when added to the payments of principal and interest on the new first mortgage, shall equal $81,000.00 per year. Said note and mortgage shall bear interest at such annual rate as will, when taken with the interest rate of the new first mortgage, produce an aggregate interest rate of 6 1/4% per annum on the total financing in the original total of $915,000.00. Said monthly installments shall commence one month after closing of title and shall continue for a total of 180 months. It is distinctly understood and agreed: That in the event the new first mortgage may be obtained in an amount greater than $450,000.00, then the amount of the purchase money second deed of trust shall be proportionately reduced. That *112 in the event that Sellers shall be unable to obtain such new first mortgage or a new first mortgage in the aforesaid amount, then the purchase money second deed of trust will be proportionately increased; That it is the intention of the parties, that at the time of closing of title, there shall be exactly $915,000.00 of financing, bearing interest at not more than 6 1/4% per annum, principal and interest payable in constant monthly payments not exceeding $81,000.00 per year, for a term of fifteen (15) years. The contract required warranties of the sellers as to the title to the property, the representations which had been made to the buyers as to income and operations of the motel, and the payment of all required assessments and license fees. The contract further provided: 6. NOTE AND DEED OF TRUST: Buyer or his Assignee, if any, shall execute the note or notes representing the deferred portion of the purchase price, together with a deed of trust in statutory short form, a copy of which is annexed hereto and marked Exhibit "M-1," as collateral for the payment of said note or notes, together with a chattel mortgage, a copy of which is annexed hereto and marked Exhibit "M-2" as *113 further collateral. Said deed of trust and chattel mortgage, drawn without charge to Buyer, shall include the following provisions: * * * (g) Nothing contained in this or any other related instrument shall obligate the Grantor further than to bind his right, title and interest in the subject premises and on default hereunder, no deficiency or other personal judgment shall be rendered or entered against the Grantor and the holder of this deed of trust shall look solely to the subject premises for the recovery of the indebtedness. (h) This deed of trust or mortgage is subject and subordinate to the present first mortgage in the sum of $ (insert unpaid balance of principal of first mortgage debt as of title date), and to any renewals or extensions thereof and to any new first mortgage or deed of trust placed in lieu thereof, provided, that the excess of the net proceeds from such renewal, extension or new mortgage or deed of trust over and above the amount then unpaid on the existing first mortgage shall be paid and applied in reduction of the principal of this deed of trust. The payment of such excess or any other prepayment shall not be deemed a prepayment of the next ensuing *114 installments of principal, but shall be a prepayment of the last installment in inverse order. The holder hereof, will, on demand and without charge therefor, execute, acknowledge and deliver any agreement or agreements reasonably required to effectuate this subordination. (i) Nothing herein contained either expressly or by incorporation of any statute or law shall be deemed to incur personal liability on the part of any owner of the subject premises to pay the existing secured indebtedness or any extension, renewal, or replacement thereof. (j) In the event the Buyer shall suffer any loss arising out of the breach of the indemnity provisions of paragraph "10" of this agreement, Buyer may reimburse himself for such loss out of the next ensuing mortgage payments due Sellers. 1034 (k) In the event that the then owner of the subject premises is unable to raise a new first mortgage, at the time the new first mortgage is due and payable, in an amount sufficient to pay the then unpaid balance of principle [sic] on said first mortgage, and on this mortgage, for a term of at least ten years with payments of principle [sic] and interest not exceeding $81,000.00 per year and at *115 an interest rate, not in excess of the then usual interest rate, then the term of this mortgage shall be extended two years. (l) This deed of trust, or mortgage shall be subject to any increase in the existing first mortgage or any new financing, provided the proceeds of such increase or new financing shall be used to pay the cost of constructing and equiping [sic] additional motel rooms and provided that such proceeds does [sic] not exceed 50% of the appraised value of the motel rooms, as appraised by the mortgage lender. The holder hereof, will on demand and without charge therefore [sic], execute, acknowledge and deliver any agreement or agreements reasonably necessary to effectuate this subordination. (m) That in the event of an uncured default the beneficiary of this deed of trust shall be entitled to appointment of a receiver who is hereby authorized to collect and receive all rents, profits and income, arising out of the operation of the subject premises, and to enter into possession of said premises and manage same. The said receiver shall be entitled to so act without bond or other security for the faithful performance of his duties. * * * 10. PAYMENT OF CREDITORS: *116 At the closing of title Sellers shall execute and deliver an affidavit setting forth the total amount due their creditors (as such term is defined by the IDAHO Bulk Sales Act), and shall deposit said amount with Dale Clemons, to be held by him, in escrow, to insure the payment of creditors, other than those creditors who are to be paid by Buyer pursuant to this agreement. Upon the presentment of any claim to Buyer by Sellers' creditor, Buyer shall give Sellers notice of same and Sellers shall either pay same or defend Buyer against any such claim. Sellers agree to indemnify Buyer against any loss suffered as a result of any such unpaid claims. * * * 19. CLOSING DATE: The deed shall be delivered and the purchase price paid at 1:00 P.M., on the 1st day of December, 1961, at the office of Dale Clemons, Esq., 517 Idaho Building, Boise, Idaho. Buyer shall have the option of adjourning the date of the closing of title for two succeeding monthly periods upon the deposit of an additional $10,000.00 for each monthly adjournment. Each of said additional $10,000.00 deposits shall be paid to and held in escrow by Dale Clemons, Esq., until the actual closing of title. On November 13, 1961, Motor *117 Hotels and Powsner agreed that upon Powsner's deposit of an additional $10,000 into escrow the closing date would be extended to January 1962. Powsner had not received approval from the Securities and Exchange Commission for the issuance of securities to finance the purchase and for that reason needed the extension. On January 13, 1962, Powsner requested an extension of the closing date to March 1, 1962, and upon Motor Hotels' agreement to this further extension an additional $15,000 was deposited with Dale Clemons into escrow on January 17, 1962. On February 23, 1962, Powsner requested an extension of the closing date to March 20, 1962, and deposited another $10,000 into escrow on February 28, 1962. Powsner notified the corporation that the Securities and Exchange Commission had given the approval sought. On April 1, 1962, it was agreed to extend the closing date to May 1, 1962, upon an additional deposit of $10,000 with Dale Clemons. At this time Clemons was also authorized to release the $60,000 held in escrow to Motor Hotels. Pursuant to an agreement between Motor Hotels and Powsner on April 1, 1962, the purchase price for the corporation's assets was increased by $10,999.50 to *118 make a total purchase price of $1,170,999.50. On the closing date of May 1, 1962, the further sum of $195,999.50 was paid to the corporation making a total cash payment of $255,999.50. Prior to the closing Motor Hotels was notified of the assignment of Powsner's rights under the contract to the Kralco Company, a partnership organized under the laws of New York. As agreed in the contract for sale, a promissory note for $465,000 was issued by the buyers to Motor Hotels payable in monthly installments of $3,390 and at an interest rate of 6 percent per annum. Executed along with this promissory note as security was a second mortgage on the property. The promissory note and the heretofore set forth as contained heretofore set forth as contained in the contract of sale including the 1035 restriction against a deficiency judgment against the maker and a provision that in "the event the maker should suffer any loss arising out of the indemnity provisions of paragraph '10' of the agreement between the parties * * * maker may reimburse himself for such loss out of the next ensuing payment due on this note * * *." In accordance with the provision of the contract requiring the sellers *119 to obtain a maximum first mortgage on the property, Larsen after negotiating with several investment institutions, placed a first mortgage in the amount of $450,000 with the Idaho First National Bank of Boise, Idaho. The terms of this mortgage which was executed January 10, 1962, were that the loan be repaid at the rate of $3,360 monthly with interest at 6 1/2 percent per annum on the unpaid balances. In order to secure this mortgage the shareholders of Motor Hotels, Stratton, Schlafke, and Bryson, executed a personal guarantee of the $450,000 note secured by the first mortgage. On October 2, 1961, at meetings of the stockholders and board of directors of Motor Hotels, resolutions were adopted that the corporation be liquidated under section 337, I.R.C. 1954. [3] Pursuant to and in accordance with section 6043, Motor Hotels filed form 966 on October 30, 1961, with the district director of internal revenue for the district of Idaho. During the 12-month period following the resolution to liquidate under section 337, the shareholders received the following cash distributions directly from the corporation: Shareholder
Amount of cashdistributed
C. D. Stratton
$ 63,500.00
A. Gordon Schlafke
64,819.95
W. Earl Bryson 64,240.40
Total
$192,560.35
*120 At a special meeting of the board of directors of Motor Hotels held on May 4, 1962, it was resolved to distribute the remaining assets of the corporation, including the second mortgage note to a trust entitled, "Motor Hotels Trust," administered by the Idaho First National Bank. The distribution was to the trust only for the purpose of collection for the shareholders. In accordance with their proportional stock interest, Stratton, Schlafke, and Bryson each received a one-third interest in the assets transferred to the trust. The following assets and liabilities were transferred to the trust on July 21, 1962: ASSETS
Cash
$ 9,114.52
Prepaid insurance
29.04
Second mortgage note (face amount)
465,000.00
LIABILITIES
Notes payable to Paul B. Larsen
$ 35,000.00
Income taxes
2,543.60
Other current liabilities
328.28
During 1962 each of the three shareholders received from the Motor Hotels Trust $5,728.35 as interest from the total interest of $17,185.05 paid to the trust and the amount of $2,181.65 as principal from the total payment of principal to the trust of $6,544.95. By letter dated July 21, 1962, petitioners *121 instructed the Idaho First National Bank to disburse to Paul B. Larsen and Associates, Inc., monthly, the sum of $390 from the payments received on the note held in trust, and beginning August 1, 1962, to distribute the balance of the proceeds after deducting charges of the bank and the distribution to Larsen equally to the three petitioners. Petitioners did not personally investigate the credit rating or the financial status of any of the purchasers of the assets of Motor Hotels. They relied upon Larsen who did investigate the financial conditions of both Powsner and Zinner. No financial investigation was made of the Kralco partnership or the members of that partnership. As of the date of trial of this case all required monthly payments had been made on the second mortgage note. Petitioners have not attempted to sell the promissory note and second mortgage. Under the laws of the State of Idaho, banks are prohibited by law from purchasing second mortgage notes. Petitioners have not sought to use the second mortgage note as collateral for a loan. There are no institutions located in Boise, Idaho, which are engaged in the business of purchasing second mortgage notes. There are, *122 however, corporations and other institutions in other western states, particularly California, which are engaged in the business of purchasing second mortgage notes. Bankers in Boise, Idaho, refer persons who approach them concerning the sale of second mortgage notes to such companies. Generally second mortgage notes are sold to such purchasers for discounts ranging from 25 to 60 percent. 1036 Metropolitan Mortgage and Securities, Inc., has its home office in Spokane, Washington. The business of this corporation is making mortgage loans and purchasing notes secured by first, second, and third mortgages. This corporation has purchased notes secured by second mortgages on motel properties in Idaho. This corporation acquires its funds for making loans and purchasing notes secured by mortgages through sales of debentures to the public. Generally notes secured by second mortgages are sold at a discount. The amount of the discount at which such a note is sold depends upon numerous factors. Among the factors to be considered are the value of the property securing the notes, the amount of the first mortgage as compared to such value, whether the note is negotiable and if not the nature *123 of any restrictions it carries, whether the maker of the note is personally liable for a deficiency judgment upon foreclosure of the mortgage and, if so, the financial standing of the maker, the income generated by the mortgaged property, and the length of time over which the note is to be paid. Petitioners, C. D. and Catherine Stratton, on their 1962 income tax return reported, on Schedule D, a long-term capital gain of $50,772.21 from "170 Motor Hotels, Inc." which amount was arrived at by subtracting from a $67,772.21 "Gross sales price" a basis of $17,000. Petitioners, A. Gordon and Ardis Schlafke, reported as long-term capital gain, on Schedule D of their 1962 income tax return, the amount of $34,092.16 from "Liquidating Dividend Motor Hotels, Inc." arrived at by subtracting from a "Gross sales price" of $69,092.16 a basis of $35,000.00. Petitioners, W. Earl and Mary Bryson, on Schedule D of their 1962 income tax return, reported a long-term capital gain of $51,512.61 from "Motor Hotel Trust Installment to be reported in 1962", which amount was arrived at by subtracting from a "gross sales price" of $68,512.61 a basis of $17,000.00. Respondent in his notice of deficiency *124 increased the income reported by C. D. and Catherine Stratton by $69,994.89. The explanation for this determination was that the capital gain realized from the liquidation of Motor Hotels should be increased by $144,262.00, computed by subtracting from total assets of $474,114.52, transferred to the Idaho National Bank for collection, liabilities of $41,328.52 and dividing the remainder of $432,786.00 by 3 because of petitioners' ownership of one-third of the Motor Hotels stock. Of the $474,114.52 of assets transferred to the Idaho National Bank, respondent stated that $465,000 consisted of "Second Mortgage (face value)." Respondent made comparable increases in the income as reported by A. Gordon and Ardis Schlafke and the income reported by W. Earl and Mary Bryson on their respective income tax returns for the year 1962 and gave a similar explanation for the adjustment. Ultimate Finding of Fact The restricted note and second mortgage distributed to petitioners upon complete liquidation of Motor Hotels had a fair market value on the date of its distribution of 55 percent of its face amount. Opinion The facts here show that Motor Hotels sold its assets after passing a resolution *125 of dissolution and within 12 months distributed those assets to its three shareholders. Under section 337, Motor Hotels is not taxable on the gain on the sale of its assets. Under section 331 [4] petitioners are taxable on the capital gain computed by considering the distribution to them by Motor Hotels as being in full payment for their stock. The amount of the gain, determined under section 1001 [5] is the excess of the money received by each petitioner from Motor Hotels plus the fair market value of any property other than money received by him from Motor Hotels over the adjusted basis of his stock. *126 1037 There is no issue here as to the basis of the stock to each petitioner or the amount of money distributed to him by Motor Hotels. The only issue is "the fair market value," if any, of "the property" other than money received by petitioners. Much of the argument of both parties in this case centers on whether the promissory note here involved was given as evidence of an indebtedness or in payment of an obligation. Petitioners argue that the note should not be considered as the equivalent of cash to a cash basis taxpayer but merely as an evidence of a debt due. Petitioners then contend that under such cases as Nina J. Ennis, 17 T.C. 465 (1951), and Jay A. Williams, 28 T.C. 1000 (1957), the note does not constitute payment for their stock. Respondent, in part, meets this argument by stating that the note is in payment of an indebtedness which is secured by a mortgage. He states that such a secured indebtedness differs from a contractual obligation to pay or a mere evidence of indebtedness. In our view, whether the note was in payment of an indebtedness or was merely evidence of an indebtedness is not determinativof thehe issue here involved. In *127 this case the corporation received the note and the second mortgage. The note and the second mortgage were distributed by the corporation to the petioners in redemption of their stock. The note and mortgage are certainly "property" received by petitioners to the same extent that accounts receivable of a corporation distributed to its shareholders as a liquidating dividend are "property." Under the facts of this case we consider that the note is "property" whether it is merely a contractual obligation to pay or is in payment for the Stardust Motel. However, even though the note is "property," it is still necessary to determine whether this "property" had an ascertainable fair market value when distributed to petitioners. Since distributions received by a stockholder upon complete liquidation of the corporation in which he owns stock are treated as sales of the stock with the amount of the distribution being the payment in full, if the property distributed has no ascertainable fair market value, gain or loss cannot be computed at the time of the distribution. Under such circumstances the transaction is not considered to be closed. Until the basis in the stock has been received in cash *128 or other property with an ascertainable fair market value, the stockholder has received no taxable gain but after the recovery of the basis distributions are taxed as received. Burnet v. Logan, 283 U.S. 404 (1931). In Estate of Abraham Goldstein, 33 T.C. 1032 (1960), affd. 340 F. 2d 24 (C.A. 2, 1965), rights to renewal commissions on insurance policies were held to have an ascertainable fair market value and therefore to be includable in the income of the stockholder in the year distributed to him in a corporate liquidation. Although a cash basis taxpayer would ordinarily report insurance commissions as received, when such commissions are property with an ascertainable fair market value distributed to a stockholder upon a corporate liquidation, the fair market value of that property is includable in the stockholder's taxable income upon its distribution to him. See also Stephen H. Dorsey, 49 T.C. 606, 629-631 (1968), for a discussion of the factors to be considered in determining whether a distribution to stockholders in complete liquidation of a corporation is an "open" or "closed" transaction. On the basis of all the evidence *129 in this case, we conclude that the note distributed to petitioners did have an ascertainable fair market value at the date of its distribution to them. The note was secured by a second mortgage on the property. There had been a substantial down-payment made on the property by the purchasers. The first mortgage on the property was approximately $200,000 less than the cost of the property to Motor Hotels and the inference from the record is unmistakable that the property had increased in value since it was completed by Motor Hotels. There is much testimony in this record about the amount of discount at which a second mortgage note on which the makers were not personally liable would sell, but no witness testified that such a note could not be sold or had no value. Riss v. Commissioner, 368 F. 2d 965 (C.A. 10, 1966), affirming a Memorandum Opinion of this Court, involved an installment obligation transferred by a corporation to certain dissenting stockholders for all their stock. The installment obligation was secured in part by a third mortgage on 1038 certain property. The Court of Appeals sustained the conclusion of this Court that the contractual obligation had *130 an ascertainable fair market value pointing out that such a determination was a question of fact in each case. In the instant case all of the facts point to a value of the note and mortgage transferred to petitioners. Petitioners argue that if a discount on an obligation is up to an amount of 45 to 50 percent, it follows that such obligation has no ascertainable fair market value. However, this is not the holding of the cases dealing with determinations of the fair market value of notes or mortgages or similar obligations. See Heller Trust v. Commissioner, 382 F. 2d 675 (C.A. 9, 1967), affirming on this issue and reversing on another issue a Memorandum Opinion of this Court, where certain land contracts were held to have an ascertainable fair market value of 50 percent of their face value. In the instant case one of petitioners' expert witnesses, in effect, testified that the discount rate of the note here involved would be from 25 to 60 percent. Another of petitioners' expert witnesses testified that the note could be sold at a high discount but did not state the amount of discount at which, in his opinion, it might be sold. Respondent's expert witness who had been *131 for many years engaged in the business of buying first, second, and third mortgages testified that in his opinion the note tranferred to petitioners would take a discount rate of 45 percent and therefore its fair market value at the date it was distributed to petitioners was 55 percent of its face value. We are persuaded by this testimony. In our view the factual evidence of record in this case supports the opinion of this expert witness. We therefore conclude on the basis of this record that the note here involved had a fair market value at the time it was distributed to petitioners of 55 percent of its face value. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: A. Gordon Schlafke and Ardis Schlafke, Docket No. 1747-66, and W. Earl Bryson and Mary Bryson, Docket No. 1748-66.↩
2. In Schlafke's joint tax return for 1962 the adjusted basis for the 170 shares was reported as $35,000. However, the parties have agreed that that sum should be reduced by $4,254.70 to $30,745.30.↩
3. All references are to the Internal Revenue Code of 1954.↩
4. SEC. 331. GAIN OR LOSS TO SHAREHOLDERS IN CORPORATE LIQUIDATIONS (a) General Rule. - (1) Complete liquidations. - Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock.↩
5. SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS. (a) Computation of Gain or Loss. - The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.↩