## McLAUGHLIN v. COMMISSIONER OF INTERNAL REVENUE.

### No. 6988.

Circuit Court of Appeals, Seventh Circuit.

July 9, 1940.

James A. O'Callaghan, of Chicago, Ill., for appellant.

Samuel O. Clark, Jr., Asst. Atty. Gen., J. P. Wenchel, Chief of Int. Rev., John M. Morawski, both of Washington, D. C., and Sewall Key and Warren F. Wattles, Special Asst's. to Atty. Gen., for appellee.

Before SPARKS, TREANOR, and KERNER, Circuit Judges.

TREANOR, Circuit Judge.

This cause is presented by a petition of taxpayers to review the determination of an income tax deficiency. There are three companion petitions involving the same questions of fact and law. The four causes were consolidated for hearing before the Board of Tax Appeals and have been consolidated here on stipulation that the decision in this cause shall apply to, and be determinative of, the other three. In the course of this opinion petitioner and the three other individuals whose causes have been consolidated will be referred to as the Associates or the Taxpayer.

The transactions out of which the tax claims arose related to the affairs of the Checker Taxi Company, an Illinois corporation, which supervises the operation of a fleet of approximately 2,200 taxicabs in the City of Chicago. The Taxi Company stock was owned by the drivers of the cabs, although the stock certificates were retained in the possession of the company. For several years prior to 1931 a New Jersey corporation and its subsidiary, a Delaware corporation, had sought to gain control of the Taxi Company. These corporations were engaged in the manufacture of taxicabs and sought control of the Taxi Company in order to compel the drivers to buy cabs exclusively from them. The Checker Taxi Company did not furnish cabs to its drivers. The manufacturing corporations proposed to the Associates, who were in control of the affairs of the Taxi Company, that they assist the corporations in buying up the stock of the Taxi Company. As compensation for their services the Associates were to receive one-half of the stock purchased. The Associates accepted the proposition and as the stock was bought up new certificates were issued in the name of the president of one of the manufacturing corporations and one of the Associates named Roach. When more than one-half of the stock had been purchased the manufacturing corporations declined to purchase any more stock; and they, thereupon, informed the Associates that they wished to

have as many men on the board of directors as the Associates did. The Associates refused to resign or to procure resignation of other members or to disturb the existing management. The manufacturing corporations thereupon proposed that the Associates resign and also procure resignation of all other directors so that the manufacturing corporations could obtain complete control. The corporations offered to pay the Associates $400,000 for bringing about such change in the management.

The manufacturing corporations advised the Associates that in order to secure the $400,000 for payment to the Associates it would be necessary for the corporation to hypothecate two-thirds of the stock for a loan. The Associates refused permission to the corporations to use any part of the stock belonging to the Associates and the corporations then offered to buy all of the stock of the Associates for $437,500. The Associates agreed and the stock was hypothecated for the loan of $400,000 and when the corporations paid to the Associates that sum, the Associates expended $143,166.50 to secure resignations of other officers and employees. .

The $400,000 was paid in cash on May 14, 1931, and on the same day a written "memorandum of agreement" was executed between the parties, an escrow agreement was made, and certain notes representing the $437,500 for the purchase of the stock of the Associates were executed.

There were six promissory notes, without interest; these notes fell due at intervals of six months. The first five notes to fall due were each for the principal sum of $75,000 and the principal of the last one to fall due was $62,500. These notes, together with 23,100 shares of the Checker Taxi Company stock, were deposited under an escrow agreement which will be noted more in detail in the course of this opinion.

The first note for $75,000 of the series of six notes became due and payable in November, 1931. It was paid and the Associates included the payment in their 1931 returns. The second note for $75,000 which became due May 14, 1932, was not paid; and by the terms of the escrow agreement the total amount then remaining unpaid, namely $362,500, became due and payable. The Associates were unable to collect the unpaid notes and the escrowee failed to find a purchaser for the collateral stock.

In October, 1932, the Associates accepted $90,625 in settlement of the unpaid balance on the notes. This sum was included by the Associates in their 1932 tax returns.

The primary question presented by the taxpayer, and which, if decided in his favor, renders all other questions immaterial, is stated by taxpayer as follows: Were the five unpaid notes (representing $362,500 of the total sum of $437,500) which were deposited in escrow on May 14, 1931, income received by the petitioner and his three associate taxpayers in that year, within the meaning of Section 42 of the Revenue Act of 1928, 26 U.S.C.A.Int.Rev.Acts, page 363, Arts. 331 and 332 of Regulation 74?

It is petitioner's contention that the notes were not received, in fact or law, in 1931; or if received, did not constitute income. Consequently, no income was received in 1931 on account of the notes, except the $75,000 which was received during 1931 in payment of the note which fell due during that year.

██ As a general proposition a promise to pay in the future is not treated as income of the promisee at the time of the receipt of the promise; and this is true even though the promise may be in the form of a written instrument. This is in harmony with the statements of the Supreme Court of the United States respecting the nature of "income." That Court has referred to income as * * * a gain, a profit, something of exchangeable value * * * received * * * by * * * (taxpayer)."[1] But there are decisions of the Supreme Court, and other Federal courts, which have held that the receipt of certain types of promissory obligations is a receipt of income for the face amount, or fair market value, of the obligations. The result reached in these cases has depended to a great extent upon the nature and purpose of the transaction between the promisor and promisee, the types of promissory instrument, and especially upon the presence or absence of factors which, for all practical purposes, make the instruments equivalent to cash. The courts have considered of special significance the availability of the promissory instruments for exchange, either for cash, or for property of value substantially equivalent to the face of the instrument. And such availability, in turn, depends upon the terms of the instrument, or of agreements respecting the freedom of transfer; also upon the security for the performance of the promise to pay, such as the financial condition of the promisor as well as security in the form of property, personal or real. The liquidity of the security is an important factor.[2]

In Pinellas Ice Co. v. Commissioner [3] the Supreme Court held that certain notes were properly regarded as the equivalent of cash. The necessary implication of the Court's holding was that the receipt of the notes should be treated as a receipt of cash for purposes of income taxation. In the Pinellas case a corporation had sold all of its assets to another corporation and had received therefor $400,000 in cash and three notes for $1,000,000, the balance of the purchase price. The notes carried interest, were secured by mortgage bonds and were payable in 45, 75, and 105 days respectively. The taxpayer contended that any gain was exempt under Sec. 303 of the Revenue Act of 1926, 26 U.S.C.A.Int.Rev.Acts, page 232, on the ground that the transaction between the vendor and vendee was in exchange of property for securities in another corporation pursuant to a plan of reorganization. The Commissioner of Internal Revenue determined that the petitioner derived taxable gain and assessed it accordingly under the Act of 1926. The Supreme Court upheld the Commissioner's action, commenting as follows:

"The 'vendor' agreed 'to sell,' and 'the purchaser' agreed 'to purchase,' certain described property for a definite sum of money. Part of this sum was paid in cash; for the balance the purchaser executed

---

[1] Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 193, 64 L.Ed. 521, 9 A.L.R. 1570.

[2] "The real question is, whether cash can be realized; has the equivalent of cash been received?" Paul & Mertens, Law of Federal Income Taxation, Sec. 10.05.

"If the taxpayer has the power to obtain the items in cash if he wishes it; if, by agreement, some of his monetary obligations are discharged by a payment which does not come to him at all; or if he receives some form of commercial obligations regarded as the equivalent of cash, he has been held to be in the receipt of income." Magill, When is Income Realized, 46 Harvard Law Review 933–938.

[3] 287 U.S. 462, 53 S.Ct. 257, 259, 77 L.Ed. 428.

three promissory notes, secured by the deposit of mortgage bonds, payable, with interest, in about forty-five, seventy-five, and one hundred and five days, respectively. These notes—mere evidence of obligation to pay the purchase price—were not securities within the intendment of the act and were properly regarded as the equivalent of cash. It would require clear language to lead us to conclude that Congress intended to grant exemption to one who sells property and for the purchase price accepts well secured, short-term notes (all payable within four months), when another who makes a like sale and receives cash certainly would be taxed. We can discover no good basis in reason for the contrary view and its acceptance would make evasion of taxation very easy."

In Schlemmer v. United States [4] the Court of Appeals for the Second Circuit held that a note for $30,000, which amount represented the sum due the payee for salary, was not income for the year when received. The Court was of the opinion that the note was not a payment of the debt, but merely added security; and the Court further expressed doubt that the note could have been considered income even if it had been received as payment. The Court stated its reasons for the doubt as follows:

"It [the note] did not change the substance of the debt—not being endorsed or secured—and although it was more readily disposable, that single incident was scarcely enough. There must be more than difference in the mere form of property to justify a charge of income. * * * But we need not stand on that; in any case since it was not taken as payment, it could not be treated as cash; the old debt remained, the note was no more than added security."

Respondent stresses the decision of this Court in Commissioner v. Moir. [5] The decision in that case was controlled by the Act of 1918 and the facts, as disclosed in the opinion, brought the case within a particular regulation then in force, but not material to our present inquiry. The regulation provided that in the sale of real estate where one-fourth of the purchase price was paid initially, where there was a relatively small number of deferred payments which were secured by a mortgage or other lien, the deferred payments were to be regarded "as equivalent to cash." This Court held that the facts brought the case within the regulation and therefore held that the amount of the deferred payments should be treated as income for the taxable year during which the obligation was assumed.

Do the unquestioned material facts relating to the use of the notes in question support a conclusion of law that the delivery of the notes to the escrowee in 1931 constituted a receipt of income in the amount of the face value of the notes?

We understand that the decisions, which have held that the receipt of notes constitutes a receipt of income, rest ultimately upon the factual conclusion that for purposes of the payee, the notes are for all practical purposes equivalent to cash. In no practical sense can a promissory note be said to have cash equivalency for the payee if the payee cannot exercise a power of sale or, at least, the power to pledge the note as security for a loan. In the instant case the payee not only did not have actual control or custody of the notes, but under the escrow agreement he was without legal power to obtain possession of the notes or in any manner utilize them for business purposes. The notes were delivered by the makers to the escrowee at the same time that 23,100 shares of stock were delivered on behalf of the taxpayer-associates. It is clear from the escrow agreement that the escrowee represented both the vendors and the purchaser. Under the escrow arrangement he represented the makers of the notes in respect to the custody of the notes and was under a duty not to deliver the notes to the payees. He was required "to receive payment on each note as it became due and to deliver the proceeds thereof to the petitioners," etc. As each note was paid the escrowee was required to deliver a proportionate part of the collateral stock to the vendee-maker of the notes.

Even in case of default in payment of the notes there is no provision for delivery of the notes to the payees. In case of default in payment of any one of the notes at its maturity date, and a continuance of default for a period of thirty days after a demand in writing, "each and all of said notes, would become due and payable." In such case the escrowee was directed to sell the collateral "in behalf" of the Associates. The escrowee was "further directed to bid

4 94 F.2d 77, 78.        5 7 Cir., 45 F.2d 356, 357.

at said sale such sum as is represented by the notes at the time of said sale remaining unpaid and to disburse the proceeds of said sale to * * * (the Associates) * * *, in like proportions as in this instrument heretofore specifically set forth." Since the escrowee did not have in his possession any funds of the payees to purchase the collateral security, the foregoing direction amounts to no more than an authorization to bid the amount of the unpaid balance of the notes and to credit the same to the notes. In such case, the only "proceeds" to be disbursed would be the remaining collateral security in the hands of the escrowee; and the notes would be discharged.

We are of the opinion that by the terms of the escrow agreement the notes in question were merely formal evidences of the indebtedness of the makers; that they were not intended to be, and did not at any time become, available to the payees as an equivalent of cash in any practical business or commercial sense. They were merely part of the arrangement devised for the purpose of protecting the vendors and vendee by insuring that the vendee would obtain actual possession and control of that part of the collateral stock which, under the escrow agreement, was allocated to the notes which the vendee should pay; and to assure to the Associates the proceeds of all the notes which the vendee might pay, and in case of failure to pay any of the notes, to keep available for the Associates the chance of recouping from any collateral security which remained in the hands of the escrowee.

Under our construction of the escrow agreement the escrowee did not receive and hold the notes as the representative of the Associates but as the representative of the maker. Consequently, the delivery of the notes to the escrowee did not constitute a receipt of the notes by the named payees. But even if the delivery constituted a technical receipt of the notes, such notes did not constitute income, within the meaning of income as that term has been defined by the United States Supreme Court.

The finding of facts, made by the Board require the conclusion of law that the delivery of the notes to the escrowee under the escrow agreement did not constitute a receipt of income by the petitioner for the taxable year of 1931. One of the notes for $75,000 matured during the taxable year of 1931 and was paid. This of course constituted income for the taxable year of 1931, and was included in the taxpayer's return. But it was error for the Board to hold that the remaining sum of $362,500 represented by the five unpaid notes should be treated as income received during the taxable year of 1931. To that extent the decision of the Board is reversed and the cause is remanded to the Board with instructions to re-compute the deficiency in the tax for the taxable year 1931 by excluding from income the $362,500 represented by the escrowed notes.