ESTATE of Sam MARSACK, Deceased, Betty Marsack, Administratrix, and Betty Marsack, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 13147.

United States Court of Appeals Seventh Circuit.

March 30, 1961.

A. L. Skolnik, Milwaukee, Wis., for petitioner.

Lee A. Jackson, Asst. Atty. Gen., Richard J. Heiman, Atty., U. S. Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Melva M. Graney, Atty., Dept. of Justice, Washington, D. C., for respondent.

Before DUFFY and CASTLE, Circuit Judges, and PLATT, District Judge.

DUFFY, Circuit Judge.

This is a petition for review of a decision of the Tax Court of the United States, which held there were deficiencies due from the taxpayers for the taxable years 1951 and 1953. The Court also denied taxpayers' claims for overpayments in those years and for a refund for the year 1952.

Marsack Patents Corporation was organized under the laws of the State of Wisconsin. It was the grantee of four patents concerning improvements relating to mattresses. The expiration dates of these patents were, respectively, August 12, 1958; April 14, 1959; May 19, 1959 and June 13, 1961. Marsack Patents Corporation was dissolved on December 15, 1951, on which date Sam Marsack owned all of the outstanding capital stock. Marsack received in distribution all of the assets of Marsack Patents including all rights under a license agreement with Triple Cushion Corporation,[1] and all rights under two license agreements with Parkhill Bedding, Ltd.

Sam Marsack and Betty Marsack, his wife, filed joint federal income tax returns for 1951, 1952 and 1953. Sam Marsack died on January 3, 1957 and Betty Marsack has been appointed administratrix of his estate.

Under section 115(c) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 115(c), the liquidating distribution is to be treated as an exchange of Marsack's stock (which he had held for more than six months) for the assets received, thus resulting in a capital gain. If the licensing agreements which he received had a fair market value at the date of liquidation, the liquidating distribution resulted in Marsack's receiving a long term capital gain in the amount of the difference between the cost basis of his stock and the fair market value of the licensing agreements. The 1951 liquidation would be a closed transaction in that year and royalties subsequently received in excess of the fair market value on December 15, 1951 would be taxable as ordinary income. The Tax Court found as a fact that on December 15, 1951, the licensing agreements had a fair market value of $22,500.

Taxpayers insist the licensing agreements had no readily ascertainable market value on December 15, 1951; that "the liquidating distribution" was an open transaction and no gain was realized until receipts from the licensing agreements exceeded the cost basis of the stock, and thereafter payments received would be taxable as capital gains. It follows, the crucial inquiry in this case is whether the Tax Court erred in finding the licensing agreements had a fair market value of $22,500 on December 15, 1951.

The license agreement between Marsack Patents and Triple Cushion was executed on August 29, 1940. It concerned United States patents owned by Marsack Patents. Triple Cushion was given exclusive right throughout the United States to grant sub-licenses. The Triple Cushion license was to remain in full force and effect until April 14, 1959 unless sooner terminated because of breach or default of either party. Each sublicensee agreed to pay Triple Cushion certain minimum monthly royalty payments.

The two license agreements with Parkhill had to do with two Canadian patents. These licenses were to continue until the expiration date of the last

1. On December 13, 1948, the name of the corporation was changed to Restonic Corporation.

patent which was June 13, 1961. After three years from the date of its execution, Parkhill could terminate either license at the end of any year upon giving 60 days' notice. The license could be cancelled by either party upon 60 days' notice in the event of default by the other.

During the period 1946 through 1951, Marsack Patents received royalties from Triple Cushion and Parkhill in the following amounts:

| | Triple Cushion | Parkhill |
|---|---|---|
| 1946 | $11,639.77 | $3,100.00 |
| 1947 | 10,576.82 | 3,000.00 |
| 1948 | 12,619.83 | 3,000.00 |
| 1949 | 13,569.15 | 3,000.00 |
| 1950 | 14,442.87 | 3,000.00 |
| 1951 | 11,357.40 | 2,250.00. |

During the years 1951 through 1958, Sam Marsack or his estate received royalties from Triple Cushion and Parkhill in the following amounts:

| | Triple Cushion | Parkhill |
|---|---|---|
| 1951 | $ — | $ 750.00 |
| 1952 | 13,488.26 | 3,000.00 |
| 1953 | 9,365.40 | 3,000.00 |
| 1954 | 9,321.60 | 3,000.00 |
| 1955 | 13,465.18 | 3,000.00 |
| 1956 | 15,024.73 | 3,000.00 |
| 1957 | 13,222.18 | 3,000.00 |
| 1958 | 12,000.00 | 3,000.00. |

In his deficiency notice, the Commissioner fixed the value of the license agreements at $54,165.13. On his tax return for 1951, Sam Marsack placed a value upon the license agreements of $22,500. More than three years later, in a claim for refund filed October 14, 1954, Sam Marsack stated that he had erroneously valued the license agreements at $22,-500. At the opening of the trial before the Tax Court, the Commissioner was permitted to amend his answer to the effect that at the time of the dissolution of the Marsack Patents Corporation, the license agreements had a fair market value of $22,500.

The Tax Court found as a fact, "The aggregate fair market value of the patents and licensing agreements received by Sam Marsack in liquidation of Marsack Patents in 1951 was $22,500." Taxpayers claim there is no evidence to sustain this finding. They also assert that the rights under the patents were of such a highly speculative value that, as a matter of law, they had no readily ascertainable fair market value on December 15, 1951.

Throughout taxpayers' brief, frequent references are made to the effect that the licensing agreements did not have a "readily" ascertainable market value on December 15, 1951. There is no requirement of law that the value must be "readily" ascertainable. Section 111(b), Internal Revenue Code of 1939, 26 U.S.C.A. § 111(b), states in unequivocal terms the amount realized from the transaction "shall be the sum of any money received plus the fair market value of the property (other than money) received." Ascertainment of the fair market value of property may, at times, be difficult, but except in rare cases, it is not an impossible task. As we stated in the recent opinion of this Court, Chamberlin v. Commissioner, 7 Cir., 286 F.2d 850, 853 "There is nothing about a contract providing for royalties from a patent which makes it impossible to value the rights received thereunder."

The identical language of section 111(b) of the 1939 Code, as far as pertinent here, has been contained in all the various Revenue Acts since 1924. Since 1928, the pertinent treasury regulations [2] have provided, "The fair market value of property is a question of fact, but only in rare and extraordinary

2. Article 561 of Treasury Regulations 74 and 77; Article 111-1 of Treasury Regulations 86, 94 and 101; Section 19.111-1 of Treasury Regulations 103; and Section 29.111-1 of Treasury Regulations 111.

cases will property be considered to have no fair market value." The repeated reenactment of section 111(b) without change gives the pertinent regulation the effect of law. Helvering v. Winmill, 305 U.S. 79, 83, 59 S.Ct. 45, 83 L.Ed. 52.

■ The Tax Court properly considered that payments received under the license to Triple Cushion had been quite stable and constant for the five years preceding and including 1951. The average annual receipts therefrom were $12,-367.64. The amount received in 1951 was $11,357.40. The receipts under the Parkhill Patents were even more constant for the five years before and including 1951. With one exception, the annual receipts therefrom were $3,000. In one year the royalty was $3100.

The regular and consistent royalty payments from Triple Cushion as well as from Parkhill during the seven years following 1951 would justify the inference that on December 15, 1951, there was nothing to indicate that the license fees under these patents would not continue to be paid in the same regular manner and in approximately the same amounts as had been paid up to that date, and that such payments would, in all likelihood, continue up to the expiration date of the patents.

It was also proper for the Tax Court to consider that in 1951 and again in 1952, Sam Marsack himself had set a fair market value of $22,500 on the licensing agreements as of 1951. This was at a time which predates the present tax controversy. It is true that three years later, in filing a claim for tax refund, he claimed he made a mistake. Nevertheless, Marsack who knew the value of the licensing agreements better, perhaps, than anyone else, voluntarily fixed the value of the licensing agreements at $22,500. This was a statement against interest and the Tax Court was entitled to give it weight.

Taxpayers rely on Burnet v. Logan, 283 U.S. 404, 51 S.Ct. 550, 76 L.Ed. 1143; Commissioner of Internal Revenue v. Carter, 2 Cir., 170 F.2d 911, and Westover v. Smith, 9 Cir., 173 F.2d 90. Pertinent is our statement in Chamberlin v. Commissioner, 7 Cir., 286 F.2d 850 "Chamberlin places his main reliance on the Burnet and Carter cases. In our view, neither of these cases supports his position. In the Burnet Case, the Court did not decide that contracts for indefinite payments generally have no ascertainable value, but decided that the many uncertainties there present might prevent the return of capital. At the time there were no statutes giving capital gain treatment. In a very recent case, the Ninth Circuit had occasion to examine the Burnet case, and said: 'It seems obvious this decision does not lay down any general rule which must be followed in the case at bar at any and all events.' Gersten v. Commissioner, 9 Cir., 267 F.2d 195, 198. Furthermore, in the Carter and Westover cases, the parties had stipulated that the contracts had, in fact, no ascertainable fair market value."

■■ In spite of the emphatic statement of counsel for taxpayers, our decision herein, as well as our decision in Chamberlin, does not mean that speculative contracts which contain highly contingent possibilities of future realization of income, can and must be valued for income tax purposes as a matter of law. The question is one of fact and not of law. We recognize there have been cases where courts have properly considered a contract so speculative and contingent as to make impossible the ascertainment of market value. But that is not the case here. The Tax Court made a finding of fact based upon the circumstances of this case. We think there was substantial evidence in the record to support that finding.

Judgment of the Tax Court is
Affirmed.