**Herbert KAUFMAN, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 10483.**

United States Court of Appeals
Fourth Circuit.

Argued June 22, 1966.

Decided Oct. 18, 1966.

Stanley Worth, Washington, D. C. (Scott P. Crampton, and Korner, Doyle, Worth & Crampton, Washington, D. C., on brief), for petitioner.

Jonathan S. Cohen, Atty., Dept. of Justice (Richard M. Roberts, Acting Asst. Atty. Gen., Lee A. Jackson and David O. Walter, Attys., Dept. of Justice, on brief), for respondent.

Before HAYNSWORTH, Chief Judge, J. SPENCER BELL, Circuit Judge, and LEWIS, District Judge.

J. SPENCER BELL, Circuit Judge.

Petitioner is in the real estate business in Baltimore, Maryland. Real estate in Baltimore is frequently sold not in fee simple but by transfer of a leasehold interest under lease of the land for 99 years, renewable forever. See C. I. R. v. Simmers' Estate, 231 F.2d 909 (4 Cir. 1956). These leases generally provide that they may be redeemed by the lessee at any time after five years from their creation upon capitalization of the annual rental at a rate of 6%. Some older leases are not redeemable. The practical effect is to create a mortgage of indefinite duration which the owner of the leasehold may pay off but which the owner of the reversion may not call. Petitioner's main business is the purchase of existing improved leaseholds and their resale. After purchase he normally redeems the existing ground rent and at the time of resale sells the property subject to a new ground rent calling for an increased annual payment. Petitioner's properties are normally located in declining areas and his customers normally are not able to afford more than a nominal down payment.

Since July 1, 1951, the transactions have been initiated by executing a "Standard Land Installment Contract" governed by the provisions of the Maryland Land Installment Contract Law. Md.Code Art. 21, §§ 110–116 (1957). These contracts call for a weekly payment. Out of each payment was taken interest on the unpaid balance, ground rent, taxes, water rent, insurance premiums and other public charges. The part remaining increased the purchaser's equity. When the buyer had accumulated enough of an equity to obtain a mortgage from a savings and loan association the petitioner secured such a mortgage for him and transferred title. Should the buyer default before a mortgage was obtained the seller could foreclose and gain rights in personam against the purchaser for any deficiency. These contracts could be recorded. These later contracts differed from that used by the petitioner prior to July 1, 1951, in that the prior contracts had no provision for obtaining an in personam judgment. When a mortgage was obtained the savings and loan association usually insisted on security in addition to the underlying property. Normally the association would require that a part of the proceeds of the mortgage be hypothecated to it and deposited in interest bearing accounts. As long as the mortgage was not in default the interest on these hypothecated accounts could be withdrawn. When the amount remaining due on the mortgage was reduced to a specified level the hypothecated funds were released. In addition to those hypothecations left with the savings and loan association as a result of mortgages on property which he had sold, petitioner also purchased hypothecated sums under other mortgages. Whenever it appeared that petitioner would lose his hypothecated funds due to foreclosure of the mortgage the petitioner would purchase the mortgage.

This case involves the tax consequences of three fairly distinct transactions: the signing of the installment contract, the transfer of title and mortgage, the purchase of the mortgage and consequent release of hypothecations.

## I

Before determining the tax consequences of the sale it is necessary to determine what the tax basis of the property sold should be. It is clear that there are two separate interests involved in the transaction: the right to use the property, and the reversion together with its concomitant right to ground rent payments.

There are three ways in which the petitioner proceeded: (1) The petitioner would in some instances purchase a leasehold subject to a ground rent and then resell the leasehold subject to the same pre-existing ground rent; (2) the petitioner in other instances purchased property in fee simple and then sold a leasehold subject to a newly created ground rent; and (3) the petitioner in still other instances would purchase a leasehold subject to a ground rent, redeem the ground rent, make a new lease and sell the leasehold. Petitioner here had transactions in all three categories. The computation of the basis in the first two cases is clear. In the first category the reversion never came into the hands of the petitioner; the basis of the leasehold is simply the price he paid. The second is controlled by the decision of this court in Welsh Homes, Inc. v. C. I. R., 279 F.2d 391 (1960). In that case the taxpayer had acquired land in fee simple, built houses on it, and then sold the property subject to a ground rent. There we found that though the cost of erecting the house was known and the cost of the land was known, the purchaser of the leasehold took an interest in both the building and the land and that, there-fore, to determine the basis of the leasehold the aggregate cost of the building and land must be reallocated between the leasehold and reversion retained rather than simply including the cost of the building as the basis of the leasehold and the cost of the land as the basis of the reversion retained. The government argues that the Welsh Homes allocation should also be applied to the third situation since when the petitioner redeemed the ground rent under Maryland law his interests merged into a fee simple. Starr v. Ministers & Trustees of Starr M. Church, 112 Md. 171, 76 A. 595 (1910). See Storey v. Ulman, 88 Md. 244, 41 A. 120 (1898), putting him into the same position as if he had originally purchased the land in fee simple.

On the other hand, the taxpayer contends that the basis of the leasehold should be the cost of the original leasehold plus the cost of any improvements, and that the basis of the new ground rent should be the cost of redeeming the original ground rent. He points out that allocation is unnecessary where the cost items for separable interests are identifiable, see 3A Mertens § 21.32, and argues that this principle applies here.[1]

We disagree with the taxpayer's contention. It is true that courts are not bound by technical state laws of merger, see Bell v. Harrison, 212 F.2d 253 (7th Cir. 1954), but as a practical matter, there is no material difference between this case and *Welsh Homes*. Whether property is purchased subject to a mortgage or to a ground rent, the encumbrance must be paid off in order to acquire full ownership of the land. At

---

1. The instant case involves tax years 1950 through 1954 and is therefore unaffected by the subsequent enactment of Internal Revenue Code § 1055. For tax years after 1963, this section specifies that the value of the reversion created upon the sale of the leasehold is to be considered in determining the total sale price for purposes of taxable gains and losses. Thus, if the present case had involved post-1963 transactions, the taxpayer's recognized gain would be the total value of the newly-created leasehold *and* reversion, less his *total* costs. There would be no deferral of the gain attributable to the newly-created ground rent, and no allocation problem would be presented. See Sen.Rep. No. 72, Accompanying H.R. 1597, 88th Cong. 1st Sess.1963, 1963 U.S.Code Cong. and Adm. News, pp. 627–632. The enactment took the right of deferral away from the seller and consistently gave to the leaseholder a deduction for ground rent payments as for interest.

this point, the purchaser occupies precisely the same economic position as the taxpayer in *Welsh Homes*. Any subsequently created interests will be derived from the same undivided whole and the value of each such interest derives from the total value of the whole, not from the individual components. It is therefore illusory to attribute the cost of the old ground rent solely to the basis of the new ground rent, or to attribute the cost of the old leasehold solely to the basis of the new leasehold. The ratio of the newly created leasehold to the reversion will hardly ever be the same as the ratio of the old interests in the property, for the very purpose of making the new lease with a different ground rent was to alter that ratio.[2]

Similarly, additional improvements affect both the new leasehold and the new reversion and cannot be attributed solely to the basis of either unit. We therefor affirm the tax court's use of the *Welsh Homes* formula in this case.

## II

■ Pursuant to Regulations 118, § 39.44–3(c), petitioner has reported income on installment sales on a cash receipts and disbursements basis. Having elected to report on this basis, the taxpayer is entitled to defer the reporting of income from each transaction until he has received from the buyer cash or other property in excess of his cost basis. The real questions in determining the petitioner's tax liability at points during his transactions are whether the instruments he receives have fair market value and thus are receipts of income to a cash basis taxpayer.

The tax court concluded, in agreement with the Commissioner, that upon execution of a sales contract of the type used

prior to July 1, 1951, no property having a fair market value was realized. Petitioner agrees with this finding. Upon execution of the post July 1951 Standard Land Installment Contract property having a fair market value was realized. Petitioner contends that there can be only one correct method of reporting income from sales of real property by the taxpayer; that the government cannot treat pre and post July 1951 contracts differently. This contention is in error. If there are significant differences in the contracts, there may be significant differences in their tax treatment. The post 1951 contracts give in personam rights in the nature of those under a mortgage while the pre 1951 contracts contain no such rights. Schapiro v. Jefferson, 203 Md. 372, 100 A.2d 794 (1953). The post 1951 contracts are standard form contracts for which a market exists; the earlier contracts were improvised by the petitioner.

■ The Commissioner originally determined that the post 1951 contracts had a value of 100% of their face amount at signing. This is clearly erroneous. The tax court said:

"While, as we have noted, the petitioner has failed to establish that the land installment contracts had no ascertainable fair market value at the date they were entered into, the evidence clearly shows that none of these contracts had, at the date it was entered into, a fair market value of its face amount."

The tax court found that the contracts at their inception had a fair market value of 70% of their face amount. The authority cited by the petitioner for the proposition that these contracts are valueless is distinguishable. In Morton Liftin, 36 T.C. 909, affirmed 317 F.2d

---

2. To use an extreme illustration, consider the case of the owner of a leasehold who pays a small sum for the redemption of a nominal ground rent on the property, on which stands a building worth $50,-000. He wishes to borrow $20,000 and, instead of executing a mortgage, he creates an annual ground rent of $1,- 200, which capitalized at the statutory rate of 6% is worth $20,000. Could it be said that the ratio of the new leasehold to the new reversion with the substantial ground rent will be the same as that of the old leasehold to its reversion? Clearly not.

234 (4 Cir. 1963), the instruments involved were second mortgages, while here the interests are equivalent to first mortgages in priority. Thus the property underlying the instruments in this case offers considerably more security than in *Liftin*. In Estate of Coid Hurlburt, 25 T.C. 1286 (1956), the transaction involved was an isolated one in the community and on a nonstandard form. In the instant case the transaction is a very common one in Baltimore City, on a standard form, and one for which some market existed for such contracts. We cannot, however, affirm the tax court finding that the fair market value is 70% of the face amount. Once the determination of the Commissioner is found to be invalid the tax court must determine the deficiency. Cohen v. Commissioner of Internal Revenue, 266 F.2d 5, 11 (9 Cir. 1959). That determination must be based upon substantial evidence and it is incumbent on the Commissioner, not the taxpayer, to come forward with that evidence. We conclude, therefore, that there is a receipt of property with a fair market value at the inception of the Standard Land Installment Contract and that it should be recognized; however, we remand in order that the tax court take further evidence as to what that amount should be.

### III

There is further recognition of income when the mortgage is granted by the savings and loan association. Clearly the money proceeds of the mortgage must be recognized. Taxpayer questions, however, whether any of the amount which is hypothecated to the association and not released for a considerable period of time should be recognized. The Commissioner determined, and the tax court agreed, that these deposits should be valued at 50% of their face amount. This court last considered the identical question in Barham v. United States, 256 F.2d 456 (1958). In that case we determined that no part of the hypothecation should be treated as income until it was released. There was,

however, a specific finding in *Barham* that "While it is true that taxpayers had an equity in the hypothecated shares, which they could sell if they could find a purchaser, that equity had no market value * * *" (at 458). The instant case differs in respect of that fact. There is no question that in Baltimore a market exists for hypothecations. Though he has never sold any of his own hypothecations, the petitioner has purchased hypothecations of others. During the years involved petitioner purchased hypothecations having a face amount of $208,800 at a total cost of $79,374.78. The tax court sustained the finding of the Commissioner that the hypothecations originally set up by the petitioner had a value of 50% of their face amount "since petitioner has failed to show error in the value determined by [the] respondent." We cannot agree with this finding. The tax court determined that in his own purchases of hypothecations petitioner "gave consideration both to the value of the property on which the mortgage for which the hypothecation was additional security was placed and to the credit standing of the mortgagor. *He was selective in his purchases.*" (Emphasis added.) The market value, i. e., the prices actually paid by the petitioner, represented only 38% of the face amount of these hypothecations. It is difficult to see how the market value of petitioner's original hypothecations could be higher than the market value of this selected group. We, therefore, remand in order that the tax court may take evidence as to their value.

### IV

Some of the underlying mortgages having hypothecations, both original and purchased, which the petitioner held went into default. Rather than risk losing his hypothecation petitioner would purchase the defaulted mortgage. Petitioner contends that in such a situation the hypothecation which was consequently released should not be treated as income but should be a reduction in the cost price of the purchase of the related mortgage. Respondent contends

that the two transactions are not so related. The tax court supported the Commissioner. We agree with the finding of the tax court. There has been no showing that the mortgage purchased had a market value of less than the purchase price. The mortgages in all cases were supported by valuable property. In such a situation there seems to be no reason to delay the realization of income from the date of the release of the hypothecation. In some cases it was even possible to arrange for the mortgagor to continue payments and fully satisfy the mortgage.

Petitioner further contends, however, that the government may not recognize income upon the release of hypothecations since it took a contrary position in petitioner's prior criminal trial covering the same transactions. This contention is without merit. The issue in the criminal trial was whether the defendant willfully evaded the payment of taxes, not the exact amount of those taxes. Because the government used a computation more favorable to the petitioner at the earlier criminal trial should not estop the government from seeking in this civil proceeding to collect the proper amount of tax due.

### V

Petitioner further objects to the inclusion in his income of amounts for "ground rents" for periods prior to the time that the ground rent was created. The Standard Installment Contract reads as follows:

"The above principal balance, together with the following listed expenses, shall be paid by the Buyer to the Seller * * *

* * * * * *

Annual Ground Rent (if any) $....."

In contracts on properties where there was no existing ground rent the tax court found that the petitioner after "the printed designation in the contract 'Annual Ground Rent (if any)' * * * [inserted] the same figure for ground rent" as the amount which was to be charged after creation. Absent clear and convincing proof that the taxpayer did not in fact deduct the amount he claimed in his contracts from the amount of payment on principal by the buyers, such amount should be considered as income. It is immaterial that such a contract might be illegal under Maryland law. The tax court was correct in finding that the payments were "not in fact either interest or ground rent but an agreed yearly payment which is not to be used to reduce the principal indebtedness."

We have considered the other questions raised by the taxpayer and find them to be without merit.

The decision of the tax court is reversed in part and remanded for entry of an order compatible with this opinion.

Reversed and Remanded.