WARREN JONES COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 424–71.  Filed August 7, 1973.

*Warren V. Clodfelter*, for the petitioner.
*Thomas N. Tomashek*, for the respondent.

DAWSON, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax in the amount of $2,523.94 for the taxable year ended October 31, 1968. The only issue to be decided is whether the petitioner, a cash basis taxpayer, realized income in 1968 upon the sale of appreciated property in return for a deferred-payment obligation under a real estate contract.

### FINDINGS OF FACT

Some facts have been stipulated by the parties and are found accordingly.

Warren Jones Co. (herein called petitioner) was incorporated in the State of Washington in 1955. Its principal place of business was in Seattle when it filed its petition in this proceeding. Its Federal corporate income tax return for the taxable year ended October 31, 1968, was filed with the district director of internal revenue at Tacoma, Wash.

Petitioner uses the cash receipts and disbursements method of accounting. It is owned by Marlyn L. Jones and Wayne R. Jones, both of Seattle. It owned and operated two residential rental properties in Seattle and one coin-operated laundry and drycleaning facility. The sale described herein was not made in the ordinary course of petitioner's business.

In December 1955, petitioner acquired the Wallingford Court Apartments at a cost of $145,961.02. On June 15, 1968, its adjusted basis in the property was $61,913.34.

On May 27, 1968, petitioner entered into a real estate contract with

Bernard J. Storey and Jo Ann Storey. Under the terms of the contract the Storeys purchased the Wallingford Court Apartments for a total price of $153,000.[1] The date of closing was set for June 15, 1968, at which time the Storeys made a cash downpayment of $20,000. The balance of $133,000 was payable $1,000 per month over the next 15 years. Interest on the declining balance was payable at the rate of 8 percent per year. At the end of the 15-year period the balance due is to be paid in a lump sum. Upon receiving full payment the petitioner is to execute and deliver to the Storeys a statutory warranty fulfillment deed to the property.

The Storeys took possession of the apartment building after the purchase from petitioner and began managing it. The apartment tenants mail their rent payments to them at their home. They pay the property taxes and insurance on the building. At the time of the purchase in 1968 the Storeys' assets exceeded their liabilities by $200,000 to $300,000. They had sufficient resources to meet their obligations as they matured in the ordinary course of business.

During the remainder of its 1968 taxable year following the sale the petitioner received the cash downpayment of $20,000 plus four monthly payments of $1,000 each. Of this total of $24,000, $20,457.84 was principal. The difference was interest.

On its Federal corporate income tax return for 1968 the petitioner reported no gain on this sale, stating as follows:

Taxpayer reports income and expenses on the cash method of accounting, and, in accordance with Nina J. Ennis v. Com., 17 TC 465, no profit is realized until the basis of the property sold has been recovered. * * *

If it is ultimately determined that taxpayer is not entitled to use the recovery of cost method of accounting for the sale, then taxpayer hereby elects to use the installment method of reporting * * * [Provided under sec. 453, I.R.C. 1954.]

Petitioner claimed that its "unrecovered cost" was $43,577.65 as of October 31, 1968.

The only evidence of indebtedness associated with this transaction was the real estate contract. No notes, securities, or other such instruments passed between the Storeys and the petitioner.

The transaction between the Storeys and the petitioner was a completed sale in the taxable year ended October 31, 1968.

Real estate contracts of the type entered into by the petitioner and the Storeys are regularly bought and sold in the Seattle, Wash., area.

At the time of this sale there were funds available in the Seattle area for investment in real estate contracts of this type. Savings and loan associations provided the principal market for such real estate con-

---

[1] Expenses incident to the sale totaled $607.15. A Washington State excise tax of $1,515 was paid. The proper treatment of that tax has been agreed to by the parties and, therefore, is not in controversy.

tracts. There were also other buyer markets available, such as mutual savings banks, investment debenture companies, and pension and trust funds.

The real estate contract in question had a fair market value of approximately $76,980 at the time of sale. It was transferable to a buyer for that amount at that time.

In his notice of deficiency dated October 19, 1970, respondent determined that a long-term capital gain of $12,098 resulted from the installments received in 1968 on the sale of the Wallingford Court Apartments.

OPINION

Petitioner constantly hammers away at the point that the contract entitling it to receive in the future the purchase price on the sale of the real estate in question was not the equivalent of cash. In support of this argument it relies heavily upon the case of *Nina J. Ennis*, 17 T.C. 465 (1951), and urges us to conclude that it realized no gain in 1968 when the property was sold. It is contended that the fair market value of the contract is not the equivalent of cash because a contract having a face value of $153,000 when received is not the equivalent of $76,980.

Respondent contends that the real estate contract has an ascertainable fair market value, is readily marketable, and is the equivalent of cash. He argues that it is "property (other than money)" under section 1001(b), I.R.C. 1954,[2] and, to the extent of its fair market value, constitutes an amount realized by the petitioner in the year of sale. Thus respondent asserts that the petitioner should not be permitted to defer the reporting of gain from the sale until cash payments received under the contract exceed the adjusted basis of the property sold. Respondent acknowledges, however, that petitioner's election (claimed alternatively) to use the installment method of reporting gain under section 453 is proper.

We are satisfied that the following facts hold true: The petitioner could have sold this real estate contract to a buyer, such as a savings and loan association, for approximately $117,980, which figure represents an 11-percent discount off the contract balance of $133,000. The 11-percent discount would give the buyer of the contract a 9½-percent yield on the money loaned, in effect, to the buyer of the building. However, because the property was relatively old and the payment period for the contract was relatively long, it is likely that a buyer of the contract would have wanted to keep the "loan" to the buyer of the property at a maximum of 60 percent of $153,000 or approximately

---

[2] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

$92,000. To do so, a buyer, such as a savings and loan association, would have required the contract seller (petitioner) to deposit approximately $41,000 of the $117,980 contract purchase price in a savings account and to assign that account to it, the savings and loan association, in order to secure the first $41,000 worth of payments by the buyer of the property in reduction of the $153,000 debt. The petitioner would not be entitled to the $41,000 in the year of the hypothetical sale of the contract. It would only be entitled to this amount—plus any interest—if and when the "loan" to the buyer of the property amounted to no more than $92,000.

On the basis of these facts and in view of the parties' arguments, we hold for the petitioner on the ground that the contract here involved is not the equivalent of cash.

Respondent has made out a rather strong case in support of his position, but in our judgment he has not cleared one major hurdle. It has been established that the real estate contract has an ascertainable fair market value. In that respect this is the usual case because "only in rare and extraordinary cases will property be considered to have no fair market value." Sec. 1.1001–1(a), Income Tax Regs. See also *McCormac* v. *United States*, 424 F. 2d 607 (Ct. Cl. 1970); *Darby Investment Corporation* v. *Commissioner*, 315 F. 2d 551 (C.A. 6, 1963); *Marsack's Estate* v. *Commissioner*, 288 F. 2d 533 (C.A. 7, 1961); *Chamberlin* v. *Commissioner*, 286 F. 2d 850 (C.A. 7, 1960); *Gersten* v. *Commissioner*, 267 F. 2d 195 (C.A. 9, 1959); *Estate of Abraham Goldstein*, 33 T.C. 1032 (1960); *Pat O'Brien*, 25 T.C. 376 (1955). It has also been established that there was a market in the Seattle area for real estate contracts such as this particular contract and that it was salable. Cf. *Estate of Clarence W. Ennis*, 23 T.C. 799 (1955); *Western Oaks Building Corp.*, 49 T.C. 365, 376–377 (1968). But it has not been shown that the contract could be sold except for a price discounted by almost 50 percent. This price is exclusive of the $41,000 which petitioner could not have received outright.

As previously noted, the petitioner could not have sold the real estate contract and received in return $117,980—a figure which itself reflects a sizable discount for risk. At best it would have received only $76,980. It would have been compelled to accept the difference, $41,000, either in the form of an escrow account (the buyer of the contract placing the money in escrow, interest accruing to petitioner) or an assigned savings account (the petitioner placing the money in a savings account and assigning it to the buyer as security, interest accruing to petitioner). Whichever form was adopted, the arrangement would amount to a deposit in escrow; petitioner's receipt of the fund would be contingent upon the performance of the buyer of the building on the underlying

sales contract; and the fund would not be payable to petitioner at its command. As a matter of law the petitioner would not be in constructive receipt of this money. E.g., *McLaughlin* v. *Commissioner*, 113 F. 2d 611 (C.A. 7, 1940); *Harold W. Johnston*, 14 T.C. 560 (1950). See generally 2 Mertens, Law of Federal Income Taxation, sec. 10.05 (Malone ed. 1967). This conclusion is supported by respondent's decision in this case to exclude the $41,000 from the "amount realized."

In light of all this, we think it is incorrect to treat this contract as the equivalent of cash.[3] Certainly respondent cannot treat an evidence of indebtedness as the equivalent of cash simply because it can be sold at a small fraction of its face value. Cf. *Donald C. MacDonald*, 55 T.C. 840, 860–861 (1971). In this case, in round numbers, the results of respondent's position (absent an installment election) would be as follows: (1) Petitioner would have to report all the gain in the year the contract was made, and thus pay the tax before receiving the deferred payments on the contract; (2) it would not have the deferred payments and, if forced to sell the contract to pay the tax, it would also not have access to the $41,000 set aside in the savings account (or escrow account); (3) most importantly, the amount of petitioner's capital gain resulting from this transaction would be permanently limited to the difference between its basis ($62,000) and the "amount realized" ($76,000) as determined by respondent; and additional amounts received, as much as the difference between $76,000 and $153,000, would be taxed as ordinary income. Since the transaction would be closed in the year the property was sold, any additional amounts would not be received in connection with the sale or exchange of a capital asset. Yet if the petitioner had eschewed the deferred-payment sale and sold the property for a lump sum, its capital gain would have amounted to the difference between basis and at least $117,000 (allowing the buyer a very large price reduction) and it would have avoided having any ordinary income.

Of course we would have a different case to decide if the $41,000 "set aside" could be included in petitioner's income in the year of sale of the building.

In *Cowden* v. *Commissioner*, 289 F.2d 20 (C.A. 5, 1961), reversing and remanding 32 T.C. 853 (1959), the Court of Appeals summarized the test of cash equivalence as follows:

We are convinced that if a promise to pay of a solvent obligor is unconditional and assignable, not subject to set-offs, and is of a kind that is frequently transferred to lenders or investors at a discount not substantially greater than the generally prevailing premium for the use of money, such promise is the equivalent

---

[3] We note that on these facts it is perhaps improper to speak in terms of "fair market value" (since no one would willingly sell *this* contract for such a highly discounted figure) or "readily marketable" (since the ease of marketability rests upon the cheap selling price).

of cash and taxable in like manner as cash would have been taxable had it been received by the taxpayer rather than the obligation. * * * [289 F.2d at 24.]

Although the focus of the *Cowden* case was not on the discount issue (there being only a nominal discount involved therein), it is our view that this test, at least as it pertains to the discount issue, is an eminently practical one. It enables courts to determine the question of cash equivalence fairly on a case-by-case basis. Under it, we need not draw a fixed line as to the amount of risk discount which will for all time and in all cases be too much to allow a finding of cash equivalence.[4] It is also consistent with past and recent decisions of this Court. See *Harold W. Johnston, supra;* cf. *Estate of Coid Hurlburt*, 25 T.C. 1286 (1956); *Western Oaks Building Corp., supra.*

Here it is important to consider our opinion in *Harold W. Johnston, supra.* The cash basis taxpayer in that case sold property (and made delivery) in 1 year pursuant to a contract calling for payment of one-half of the estimated purchase price to an escrow account, distribution to the taxpayer to occur in another year, and payment of the remainder of the purchase price after events in the second year fixed the final amount. The taxpayer argued, first, for constructive receipt of the escrowed amount in the first year and, second, for the treatment of the contract as the equivalent of cash, leading to the receipt of the balance of the purchase price in the first year. After disposing of the first argument, this Court stated:

[Petitioner's argument] is contrary to his method of reporting income, the cash receipts method. The present situation demonstrates the difference between the cash receipts method and the accrual method. An agreement, oral or written, of some kind is essential to a sale. If payment is made at the same time that the obligation to pay arises under the agreement, then the profit would be reported at that time no matter which method was being used. *However, the situation is different when the contract merely requires future payments and no notes, mortgages, or other evidence of indebtedness such as commonly change hands in commerce, which could be recognized as the equivalent of cash to some extent, are given and accepted as a part of the purchase price.* That kind of a simple contract creates accounts payable by the purchasers and accounts receivable by the sellers which those two taxpayers would accrue if they were using an accrual method of accounting in reporting their income. *But such an agreement to pay the balance of the purchase price in the future has no tax significance to either purchaser or seller if he is using a cash system.* The petitioner may not thus adopt, for this limited purpose, a feature of an accrual method, but, having always used a cash receipts method of reporting his income, he must adhere consistently to the general rule of that method, which is that no gain is realized until the "amount realized" by receipt exceeds the basis for the property being sold. *It would be quite inconsistent under that method to value a contract like the present one and include that value in the "amount realized" under section 111(b).* * * * [Emphasis added.]

---

[4] We read the decision in *Heller Trust* v. *Commissioner*, 382 F.2d 675 (C.A. 9, 1967), as resting on the determination that the bare land contracts at issue had an ascertainable fair market value. Compare *Heller Trust* with *Willhoit* v. *Commissioner*, 308 F.2d 259 (C.A. 9, 1962), and *Phillips* v. *Frank*, 295 F.2d 629 (C.A. 9, 1961).

See also 2 Mertens, Law of Federal Income Taxation, sec. 11.05, p. 17 (Malone ed. 1967), where it is said:

The fundamental difficulty in these deferred payment cases is that to treat every evidence of indebtedness in the hands of a cash basis taxpayer as the equivalent of cash to the extent of fair market value obliterates the fundamental difference between the cash and accrual methods as to the treatment of receivables. * * *

Cf. *Estate of Coid Hurlburt, supra; Western Oaks Building Corp., supra* at 376–377.

Accordingly, we conclude in these particular circumstances that the petitioner correctly deferred the reporting of income from the sale in 1968. See and compare *Estate of Lloyd G. Bell*, 60 T.C.469 (1973), a private annuity case involving a security arrangement.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

RAUM, *J.*, did not participate in the consideration or disposition of this case.

———

SCOTT, *J.*, concurring: While I agree with the conclusion reached by the majority, I disagree with much of the reasoning used to support that conclusion. In my view the question here is a factual one of whether the contract between petitioner and the Storeys was "property (other than money) received" by petitioner upon the sale of its apartment building. If this contract was "property * * * received" the "fair market value" of that property is part of the amount realized by petitioner from the sale of the apartment building. Sec. 1001(b), I.R.C. 1954. Both the majority and the two dissenting opinions discuss the legal criteria for determining whether a contractual obligation given in connection with the sale of property is ascertainable with sufficient certainty and the contract has sufficient marketability to constitute "property (other than money) received," within the meaning of section 1001(b). In my view under these various criteria, the facts as found by the majority support the conclusion that the contractual obligation received by petitioner was not "property" within the meaning of section 1001(b). The mere fact that there is no impediment to the sale of a contract and the contract could be sold for some amount does not require the conclusion that the contract is sufficiently marketable or has a fair market value sufficiently ascertainable as to constitute "property" within the meaning of section 1001(b).

———

TANNENWALD, *J.*, dissenting: I would normally abjure disagreeing with the trier of the facts in a case such as this, where the issue involved is essentially factual. See *Wingate E. Underhill*, 45 T.C. 489

(1966). But the majority herein has put its stamp of approval on the decision of the trier of the facts by articulating a rationale which extends the "open transaction" doctrine of *Burnet* v. *Logan*, 283 U.S. 404 (1931), to a situation where the property received by the taxpayer not only had a fair market value but was also marketable, albeit at a discount.[1] In my opinion, such an extension is totally unwarranted on the basis of the facts in this case.

Admittedly, the determination of proper tax treatment by a cash basis taxpayer of a transaction, such as is involved herein, is not without its difficulties. See *Wingate E. Underhill, supra* 45 T.C. at 492–493. In large part, this is due to the fact that many of the decided cases are confusing in their application of concepts of "constructive receipt," "cash equivalence," and "negotiability." See *Cowden* v. *Commissioner*, 289 F. 2d 20 (C.A. 5, 1961), reversing and remanding 32 T.C. 853 (1959).

To me, there are several elements to be taken into account in determining whether a transaction should be considered as being "open" or "closed," i.e., whether a taxpayer should be entitled to use the deferred-payment or cost-recovery method of reporting income therefrom. Among these, the "marketability" of the property involved is important, albeit not conclusive. In using this word, I do not mean that it is enough if the facts show that the property could be sold to a third party. Cf. *Donald C. MacDonald*, 55 T.C. 840, 860–861 (1971). Rather, marketability implies a recognizable group of prospective buyers so that it can be said that the property is of a type that "commonly change[s] hands in commerce." See *Harold W. Johnston*, 14 T.C. 560, 565 (1950). In the usual case, a determination that the property has a fair market value will be determinative of its marketability.[2] But this is not always the case, e.g., where property is exchanged for an annuity. Compare Simpson, *J.*, dissenting in *Estate of Lloyd G. Bell*, 60 T.C. 469 (1973). See also *Wingate E. Underhill, supra* at 494. In this case, however, there is no need to dwell upon any distinction between fair market value and marketability because the facts clearly reveal that there was a market in the Seattle area for the obligations of the purchasers which the petitioner received. Indeed, I have great difficulty in reconciling the majority decision herein that the transaction remained "open," which essentially rests on a finding

---

[1] I note in passing that the application of this doctrine has been criticized even where the transaction fits the limited mold of *Burnet* v. *Logan*. See Simpson, *J.*, dissenting in *Stephen H. Dorsey*, 49 T.C. 606, 634 (1968).

[2] Another way of looking at the problem conceptually is to say that the critical determination is whether the property is marketable and that, if such a determination is made, the fair market value of the property then becomes the measure of includability in determining the taxable amount.

of no fair market value in spite of evidence of marketability, with this Court's very recent decision in *Bell* that the transaction therein was "closed" because the contract had a fair market value even though the evidence indicated that it was not marketable.

That the obligations of the purchasers were not evidenced by a note or mortgage or by a negotiable instrument or that they could be sold only at a substantial discount does not require a decision in petitioner's favor. These are simply elements which enter into a determination of marketability. See *Wingate E. Underhill*, 45 T.C. at 494. Particularly with reference to the discount element, the majority decision, in my opinion, escalates one guideline out of several into a governing criterion. In so doing, it ignores prior decisions of this Court where the presence of a substantial discount did not preclude a finding that the obligations involved were marketable. Cf. *Joan E. Heller Trust*, T.C. Memo. 1965-302, affirmed as to this issue 382 F. 2d 675 (C.A. 9, 1967); *Herbert Kaufman*, T.C. Memo. 1964-127, reversed and remanded 372 F. 2d 789 (C.A. 4, 1966), on remand T.C. Memo. 1970-174, affd. 451 F. 2d 175 (C.A. 4, 1971).[3]

All of the cases relied upon by petitioner and the majority are clearly distinguishable. The decisions in *Estate of Coid Hurlburt*, 25 T.C. 1286 (1956), and *Harold W. Johnston*, 14 T.C. 560 (1950), rested on an absence of fair market value (there was evidence of marketability), with the Court also noting in *Johnston* that the amount of the purchase price was unascertainable. The same is true of the companion cases of *Estate of Clarence W. Ennis*, 23 T.C. 799 (1955), and *Nina J. Ennis*, 17 T.C. 465 (1951), the Court emphasizing in the former case that, although there was some evidence of marketability,[4] a liquor license was involved and its renewal or suspension "had considerable bearing on the value of the contract" (see 23 T.C. at 802). In *Western Oaks Building Corp.*, 49 T.C. 365, 376-377 (1968), the Court determined that the contracts were not fully transferable in commerce, although, in my opinion, too much emphasis was placed on the absence of negotiability. Cf. *Cowden* v. *Commissioner*, *supra*. The long and short of it is that all of the foregoing cases turn on their particular facts.

The hard facts as revealed by this record are that the purchasers were personally liable on the contracts and were solvent, the contracts

---

[3] In *Kaufman*, the differences between this Court and the Court of Appeals related to the quantum and not the concept of a discount. The reference in *Cowden* v. *Commissioner*, 289 F. 2d 20, 24 (C.A. 5, 1961), to "a discount not substantially greater than the generally prevailing premium for the use of money," quoted in the majority opinion, is, to my mind, misleading. Taken literally, it would have the practical effect of rendering sec. 453 nugatory, especially when that section is considered in conjunction with sec. 483.

[4] There is no indication in the opinion in *Nina J. Ennis* that any such evidence was submitted.

were marketable in the Seattle area, the purchasers were not in default, the contracts appear to have been recorded so that they were not unlike first mortgages,[5] and there is no evidence as to the character and condition of the underlying property from which one could conclude that the petitioner's ability to recover the purchase price was in serious doubt. Under these circumstances, it cannot be said that petitioner was not reasonably certain of recovering "his cost *and* a major portion of the discount." See *Wingate E. Underhill*, 45 T.C. at 495.

Accordingly, I would hold that the obligations constituted "property (other than money) received" by the petitioner and taxable to it in the year of sale. Sec. 1001. The result is that petitioner should be remitted to his alternative election of reporting on the installment method under section 453, an election which respondent has conceded was properly made.

STERRETT, *J.*, agrees with this dissent.

---

QUEALY, *J.*, dissenting: I must respectfully dissent from the majority's decision. The majority's application of a "cash equivalence" test is wholly unjustified in determining whether gain or loss has been realized under section 1001. See *Heller Trust* v. *Commissioner*, 382 F. 2d 675 (C.A. 9, 1967); *Tombari* v. *Commissioner*, 299 F. 2d 889 (C.A. 9, 1962); *Kaufman* v. *Commissioner*, 372 F. 2d 789 (C.A. 4, 1966); *Estate of Lloyd G. Bell*, 60 T.C. 469 (1973).

In this case, the petitioner meets squarely the description of the willing seller under no compunction to sell. Bernard and Jo Ann Storey were willing buyers, equally without compunction. Stated simply, the willing seller sold or exchanged certain real property to the willing buyers under a land contract for a stated consideration of $153,000, comprised of $20,000 in cash and deferred payments in the amount of $133,000 bearing interest at 8 percent per annum, payable over a period of 15 years. The agreement was secured by the property and constituted the personal liability of the buyers who had ample resources to meet that obligation. There was a ready market for such contracts and they were freely traded in the community.

In my view, the acceptance by the petitioner of a contract which provided for the payment of $133,000 plus interest over a period of 15 years, regardless of the discount which might result if petitioner had sought to sell the contract for cash, does not require the deferral of any accounting for the resulting gain over such term. In this respect, the situation presented is no different from the case where a mortgage is taken in exchange for real property. See dissenting opinion of Judge Turner, *Nina J. Ennis*, 17 T.C. 465 (1951).

[5] Compare *Wingate E. Underhill*, 45 T.C. 489, 496 fn. 10 (1966).

Under section 1001,[1] the petitioner must compute its gain on the basis of the sum of any money received *plus the fair market value of the property (other than money) received.* There is no dispute that the petitioner received money in the amount of $20,000. It also received a contractual obligation in the amount of $133,000 which a willing buyer would purchase for $117,980, conditioned upon a pledge back of a specified portion thereof.[2] That contract must be deemed to constitute other "property" within the meaning of section 1001(b).

Accordingly, it is my opinion that the petitioner realized gain at the time of the sale, measured by the difference between the sum of the money received ($20,000) plus the fair market value of the remaining contract (a maximum of $117,980) and his basis for the property ($61,913.34). Such gain may be accounted for on the "installment basis" pursuant to the provisions of section 453.

STERRETT, J., agrees with this dissent.

---

[1] Sec. 1001 provides insofar as material herein:

SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS.

(a) COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

(b) AMOUNT REALIZED.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * *

[2] The finding by the majority that the contract had a fair market value in the amount of $76,980 ignores the stated fact that "petitioner could have sold this real estate contract to a buyer * * * for approximately $117,980" with the requirement that petitioner deposit $41,000 of that purchase price in a savings account assigned to the contract buyer as security. In my view, that amount must be taken into account in determining the "fair market value" of the contract. See *Kaufman* v. *Commissioner*, 372 F. 2d 789 (C.A. 4, 1966), remanding T.C. Memo. 1964-127.